922 P.2d 1304 (1996)
130 Wash.2d 244
The STATE of Washington, Respondent,
v.
William COPELAND, Appellant.
No. 62417-8.
Supreme Court of Washington, En Banc.
Argued November 16, 1995.
Decided September 19, 1996.
*1310 Nielsen & Acosta, Eric J. Nielsen, Seattle, for appellant.
Norm Maleng, King County Prosecutor, James Whisman, Cynthia Gannett, Regina Cahan, Deputies, Seattle, for respondent. *1305 *1306 *1307 *1308
*1309 MADSEN, Justice.
A jury found Defendant William Copeland guilty of first degree premeditated murder and of first degree felony murder predicated on rape in the first or second degree. He raises a number of issues, including admissibility of DNA evidence, alleged destruction of evidence, alleged material omissions from the affidavit in support of a search warrant, alleged violation of the right to counsel under CrR 3.1, and prosecutorial misconduct. His challenge to admissibility of DNA evidence includes claims that admission of expert testimony of statistical probabilities was error because it failed to adequately account for substructuring in human populations, as well as challenges to use of the FBI database for statistical probability estimates. The State argues that the Frye test for admissibility of novel scientific evidence (Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.Cir. 1923)) should be replaced with the test of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
We hold that Frye remains the standard for admissibility of novel scientific evidence in Washington, that the DNA evidence was admissible, and that none of the issues raised by Copeland require reversal of his conviction. We therefore affirm the conviction.
On May 18, 1990, Copeland was released from the King County jail a little after 9 p.m. At the time he had been booked into jail (for an unrelated offense), he was wearing a khaki shirt as shown in his booking photo.
The next day the body of Mary Jo Kizer was discovered by her son when he stopped to check on her at her condominium apartment. She was wearing a terry cloth robe and her body lay in a semi-fetal position just inside her front door. She had bled to death from several stab wounds. She had been beaten in the head, manually strangled, and an earring had been ripped from her ear. *1311 She suffered over 70 injuries. Blood spatter evidence indicated she had been attacked on the stairs in her apartment, that she went up to her bedroom where she put her robe on, and then was attacked again near the front door downstairs. She was moved after lying in a pool of her own blood for some time. The position of the body indicated a sexual motive for the assault, and the evidence indicated she had been sexually assaulted after she was attacked with a knife but before she was put in the position she was found in. Just before or after she died, she was stabbed, evidently with a barbecue fork.
During police investigation of the crime, a neighbor, Connie Taff, reported that she had seen a mulatto man walking outside the victim's apartment at 5:30 a.m. and again at 6:00 a.m. the morning of May 19, 1990. She said he was wearing a long-sleeved khaki shirt and blue jeans. The man turned and looked at her as she drove past, and they made eye contact. Detective Winters of the Kent police assisted Taff in making a composite drawing of the man she had seen using an Identi-Kit. The resulting composite looked like Copeland. Police showed the composite to other neighbors, one of whom said the composite looked like the boyfriend of an acquaintance. The acquaintance, Judy Colbert, was contacted, and she identified the composite drawing as Copeland, who had lived with her up to May 1990 when he was asked to leave because he assaulted her.
Later, Taff did not pick a photograph of Copeland out of a photo montage as the man she had seen, but selected a picture of a man who looked like Copeland as most resembling the man she had seen. At trial, she identified Copeland as the man she had seen and testified she was 99 percent certain.
The victim's next door neighbor, Jackie Sawyer, testified to hearing what she thought was a domestic violence fight. She thought she heard a woman being slammed against the wall and crying out. She later heard a dog barking, and looked out her window. She testified she saw a person she thought was a man carrying a small black dog go over the victim's back railing and walk toward the sliding glass doors at the back of the apartment. Sawyer worked with a police artist, and produced a drawing of the person she had seen, which did not look like Copeland. Sawyer said the person she saw was not Copeland. She did not pick a photograph of Copeland out of a photo montage.
Detective Himple interviewed Copeland, who described drinking at several establishments after being released from jail, and then going home. When shown a picture of Ms. Kizer, he recognized her and said he thought her name was Mary, and that he had met her through a friend about two years earlier. After Himple explained they were investigating Ms. Kizer's murder, Copeland said that after drinking he had gone to Colbert's apartment, but found no one home. He said he was given a ride to Colbert's by a waitress he knew. He told Himple he was wearing a dark brown long-sleeved shirt and showed him such a shirt. It was not the one shown in the booking photograph. While they were talking, Elaine Young, Copeland's girlfriend at the time (they later married), walked into the apartment; Detective Himple almost immediately thought she looked like Sawyer's drawing.
Himple returned to Copeland's apartment about three weeks later, and confronted him with the fact a witness placed him outside the victim's door on the morning of the murder. Copeland said that he had walked past the apartment on his way to a restaurant (this version of events contradicted his earlier account). His account placed him within 60 feet of the victim's front door on the morning of the 19th. During this interview, Copeland was asked to give biological samples, but refused. A month later, Himple returned with a search warrant for biological samples. Copeland again refused to give samples, and was handcuffed and taken to the Kent City jail where samples were obtained.
The biological samples were submitted to the FBI for DNA testing, along with that of five other suspects. Copeland's DNA matched DNA from forensic samples, and the FBI calculated the probabilities of his genetic profile randomly occurring in general populations using a method called the "product rule." The probabilities were 1 in 2.8 million using the B5 Black database, 1 in 2.9 million using the older B4 Black database, *1312 and 1 in 3 million in the C4 and C5 Caucasian databases. After testing DNA extracted from the forensic sample, the FBI discarded the remainder of the extracted DNA. The FBI preserved a vaginal wash which included sufficient DNA to test.
Following a lengthy pretrial hearing, the trial court ruled that the DNA evidence was admissible under Frye. Following other pre-trial hearings, the trial court denied Copeland's motions to suppress evidence based upon alleged material omissions from the affidavit in support of the search warrant, and upon the alleged denial of the CrR 3.1 right to counsel when the search warrant was executed, as well as his motion for dismissal or suppression of the DNA evidence based upon the FBI's failure to preserve the remaining DNA after testing.
At trial the jury heard extensive testimony from both State and defense witnesses about the DNA evidence. In addition to this testimony, which included the FBI's calculated probabilities, plus evidence of the events described above, State's witnesses testified regarding comparisons of Copeland's pubic hair with pubic hair recovered from the victim's body, other blood typing results from samples at the crime scene, blood spatter evidence, non-DNA tests of semen found on Ms. Kizer's robe, and shoe print evidence. Much of this evidence tended to tie Copeland to the crime scene. Fingerprint evidence did not.
Other evidence at trial included testimony of Copeland's cellmates Raymond Counts and Orville Siemering about Copeland's alleged jailhouse confession. Detective Winters testified about use of the Identi-Kit process for generating composites of faces. Copeland also testified in his own defense.
The jury returned a guilty verdict of premeditated first degree murder and felony murder with rape as the predicate felony. The judge imposed an exceptional sentence of 480 months, finding as an aggravating factor that the crime involved deliberate cruelty to the victim.
Direct review of Copeland's appeal was granted by this court.

FRYE STANDARD FOR ADMISSIBILITY OF NOVEL SCIENTIFIC EVIDENCE
Copeland maintains the trial court erred in ruling that the DNA evidence was admissible at trial under the Frye test (Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.Cir. 1923)). The State argues that the Frye test should be abandoned, and this court should adopt the analysis for admissibility of scientific evidence set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
This court implicitly adopted the Frye standard for admissibility in State v. Woo, 84 Wash.2d 472, 527 P.2d 271 (1974), and explicitly approved it in State v. Canaday, 90 Wash.2d 808, 585 P.2d 1185 (1978). The rationale of the Frye standard, which requires general acceptance in the relevant scientific community, is that expert testimony should be presented to the trier of fact only when the scientific community has accepted the reliability of the underlying principles. Canaday, 90 Wash.2d at 813, 585 P.2d 1185. "In other words, scientists in the field must make the initial determination whether an experimental principle is reliable and accurate." Id. The Frye standard recognizes that "judges do not have the expertise required to decide whether a challenged scientific theory is correct," and therefore courts "defer this judgment to scientists." State v. Cauthron, 120 Wash.2d 879, 887, 846 P.2d 502 (1993). The court does not itself assess the reliability of the evidence. Id. at 886 n. 2, 846 P.2d 502. "If there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted." Id. at 887, 846 P.2d 502.
Review of admissibility under Frye is de novo and involves a mixed question of law and fact. Id. at 887, 846 P.2d 502. The reviewing court will undertake a searching review which may extend beyond the record and involve consideration of scientific literature as well as secondary legal authority. Id. at 887-88, 846 P.2d 502 (quoting People v. Reilly, 196 Cal.App.3d 1127, 1134, 242 Cal. Rptr. 496 (1987)). A key reason for consideration of such material is that it is impractical in many instances for a true cross-section of scientists to testify at a hearing. Cauthron, *1313 120 Wash.2d at 887-88, 846 P.2d 502 (quoting Reilly, 196 Cal.App.3d at 1134, 242 Cal.Rptr. 496). Moreover, materials that are not available until after a Frye hearing may be considered. Cauthron (where court relied upon scientific report issued after oral argument); see also State v. Bible, 175 Ariz. 549, 858 P.2d 1152, 1189 n. 33 (1993) (new technology, evolving at a pace where general acceptance changes from time of trial to time of appellate review, is at core of what Frye designed to scrutinize), cert. denied, ___ U.S. ____, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); but see Fishback v. People, 851 P.2d 884, 892 (Colo.1993).
If the Frye test is satisfied, the trial court must then determine whether expert testimony should be admitted under the two-part test of ER 702, i.e., whether the expert qualifies as an expert, and whether the expert's testimony would be helpful to the trier of fact. Cauthron, 120 Wash.2d at 889-90, 846 P.2d 502.
Proponents of Frye agree that "it assures uniformity in evidentiary rulings, that it shields juries from any tendency to treat novel scientific evidence as infallible, that it avoids complex, expensive, and time-consuming courtroom dramas, and that it insulates the adversary system from novel evidence until a pool of experts is available to evaluate it in court." 1 McCormick on Evidence § 203, at 873 (John W. Strong ed., 4th ed.1992). The Frye standard allows "disputes concerning scientific validity to be resolved by the relevant scientific community[.]" State v. Vandebogart, 136 N.H. 365, 616 A.2d 483, 489 (1992) (citing United States v. Addison, 498 F.2d 741, 743-44 (D.C.Cir. 1974)). "In effect, Frye envisions an evolutionary process leading to the admissibility of scientific evidence. A novel technique must pass through an `experimental' stage in which it is scrutinized by the scientific community. Only after the technique has been tested successfully in ... this stage will it receive judicial recognition." Paul C. Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, Half-Century Later, 80 Colum.L.Rev. 1197, 1205 (1980).
In 1993, the United States Supreme Court decided Daubert, and held that in the federal courts, the legislatively enacted federal rules of evidence, and in particular Fed.R.Evid. 702, supersede Frye`s "general acceptance" test. Daubert, 509 U.S. at 597-98, 113 S.Ct. at 2799. The Court said that under the rules "general acceptance" is not a necessary precondition to admissibility. Id. Under Rule 702, the requirement that the expert's testimony pertain to "scientific ... knowledge" assigns to the trial court the task of ensuring that the expert's testimony rests on a reliable foundation and is relevant in that it has a valid scientific connection to the pertinent inquiry as a precondition to admissibility. Id. at 591-92, 113 S.Ct. at 2795-96. Under this new analysis, the trial judge must determine at the outset, under Rule 104(a), whether the expert will be testifying to scientific knowledge which will assist the trier of fact. This will require a preliminary determination whether the reasoning or methodology underlying the testimony is "scientifically valid," and whether it can be applied to the facts at issue.
The inquiry whether a theory or technique is scientific knowledge includes whether it can be (and has been) empirically tested; whether it has been subjected to peer review and publication; the known or potential error rate of a particular scientific technique; and the extent to which there has been general acceptance of the technique or method widespread acceptance by scientists may be an important factor in ruling particular evidence admissible, while a known technique with only minimal support in the scientific community may properly be viewed with skepticism. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2797. No proof of a particular degree of acceptance is a necessary condition to admissibility. The court's enumerated factors are not dispositive nor exclusive. Paul C. Giannelli, Daubert: Interpreting the Federal Rules of Evidence, 15 Cardozo L.Rev.1999, 2002 n. 28 (1994) (citing Daubert, 509 U.S. at 593, 113 S.Ct. at 2796 ("[m]any factors will bear on the inquiry, and we do not presume to set out a definite checklist or test")). The Court said that the judge assessing a proffer of expert scientific testimony should also consider the other rules of *1314 evidence, including Rules 703, 706, and 403. Daubert, 509 U.S. at 595, 113 S.Ct. at 2797-98. The Court reasoned that shaky but admissible evidence could be attacked by vigorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof. Id. at 596, 113 S.Ct. at 2798.
The State maintains that this court should abandon Frye and adopt Daubert. The State argues that Frye is difficult to apply. While Frye may be difficult to apply in some contexts, this is a result of the complexity of the particular science at issue, the extent to which the scientific community has made its views known, and the extent of any dispute in the scientific community. The same, or similar problems, arise under Daubert, including questions of testability, the extent to which the scientific technique or method is accepted by the scientific community, and drawing the line between legitimate science and "junk" science, along with other questions. Questions of admissibility of complex, controversial scientific techniques or methods, like those involving DNA evidence, are going to be difficult under either standard. Nevertheless, the Frye standard has endured for over 70 years, indicating that it has not been so difficult to apply as to call for its abandonment.
The State contends that ER 702 should be construed identically to the Fed. R.Evid. 702. This court has, on some occasions, found the federal interpretation of an identical rule to be persuasive. E.g., State v. Land, 121 Wash.2d 494, 497-99, 851 P.2d 678 (1993) (concerning ER 608); State v. Terrovona, 105 Wash.2d 632, 639-41, 716 P.2d 295 (1986) (concerning ER 803(a)(3)). On the other hand, federal case law interpreting a federal rule is not binding on this court even where the rule is identical "[t]his court is the final authority insofar as interpretations of this State's rules is concerned...." State v. Brown, 113 Wash.2d 520, 548, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989), approved on ER 609 issue by State v. Ray, 116 Wash.2d 531, 544-45, 806 P.2d 1220 (1991). See also Orwick v. City of Seattle, 103 Wash.2d 249, 692 P.2d 793 (1984) (rejecting federal case law interpreting Fed. R.Civ.P. 12(b)(6)).
We decline to interpret ER 702 as the United States Supreme Court has interpreted Fed.R.Evid. 702. First, while in Daubert, the Court observed that the legislative adoption of the federal rules of evidence postdated and superseded the Frye decision; in Washington the rules of evidence were adopted by this court and do not constitute a legislative enactment superseding Frye. Thus, when this court, after the rules of evidence were adopted, continued to adhere to Frye, e.g., State v. Allery, 101 Wash.2d 591, 682 P.2d 312 (1984), we signaled that Frye and the evidence rules coexist as the law of this state. Second, as explained in Cauthron, we have already interpreted ER 702 as requiring an assessment of admissibility of scientific evidence under the helpfulness standard contained in the rule, thus providing in this jurisdiction the "best of both worlds." Where novel scientific evidence is at issue, the additional Frye inquiry allows the judiciary to defer to the scientists precisely where to do so recognizes both the need for admissibility of novel scientific evidence where it is sufficiently accepted, and the need to protect against novel scientific evidence which has not even gained general acceptance in the relevant field. The trial court's gatekeeper role under Frye involves by design a conservative approach, requiring careful assessment of the general acceptance of the theory and methodology of novel science, thus helping to ensure, among other things, that "pseudoscience" is kept out of the courtroom. ER 702 has independent force and effect, which we have both recognized and emphasized. This case does not merely present an issue of Frye versus Daubert, because in this state ER 702 has a significant role in admissibility of scientific evidence aside from Frye.
We have been offered no sound reason to depart from our own standards for admissibility of scientific evidence, and we conclude that Daubert has drawbacks which we decline to import into our standards for admissibility. For example,
[t]rial judges are left with a difficult taskas scientific, mathematical, and technical *1315 lay persons, they must analyze opinions involving matters far beyond their knowledge. When the evidence comes from scientific sources, judges will be required to understand not only the specific scientific evidence, but also the world of science, since the Supreme Court has now instructed trial judges to determine, as an admission threshold, whether the evidence is in fact "scientific knowledge." The Court directed judges that scientific knowledge must be learned through scientific methods, and referred to several books on the philosophy of science that are not likely to be found in courts' libraries.
Howard A. Denemark, The Search for "Scientific Knowledge" in Federal Courts in the Post-Frye Era: Refuting the Assertion that "Law Seeks Justice While Science Seeks Truth," 8 High Tech. L.J. 235, 237 (1993) (footnotes omitted); see also Daniel R. Fisher, Daubert v. Merrell Dow Pharmaceuticals: The Supreme Court Gives Federal Judges the Keys to the Gate of Admissibility of Expert Scientific Testimony, 39 S.D. L.Rev. 141, 155 (1994) (district court judges given responsibility and authority beyond the knowledge and abilities of the court in many cases).
We note that at least two courts have declined to decide whether Daubert should be adopted where DNA evidence was involved, precisely because of the complexity and controversy of the science. State v. Bible, 175 Ariz. 549, 858 P.2d 1152 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); State v. Carter, 246 Neb. 953, 524 N.W.2d 763 (1994). Some commentators have noted the Daubert approach is also problematic where behavioral and social sciences are concerned, for two reasons: judges may lack the understanding of scientific principles and methodology to evaluate science, including social science, as now required by Daubert, and certain social and behavioral sciences may be inherently inconsistent with Daubert's criteria such as falsifiability (testability) and error rates. James T. Richardson et. al., The Problems of Applying Daubert to Psychological Syndrome Evidence, 79 Judicature 10 (July-Aug.1995).
While we do not intend this to be an exhaustive critique of Daubert, these problems and potential problems, the advantages of the Frye analysis, and our careful assessment of the requirements for admissibility of scientific evidence in Cauthron, convince us to reject the Daubert analysis and reaffirm our adherence to the Frye standard where novel scientific evidence is concerned.

ADMISSIBILITY OF DNA EVIDENCE
Initially, Copeland complains that the trial court recited an incorrect formulation of the standard for admissibility under Frye. While the court did not recite the standard set forth in Cauthron (decided after the Frye hearing in this case), the error is of no significance, as we review admissibility under Frye de novo under the correct legal standard.
Copeland argues that the FBI's statistical methods for declaring a "match" and for calculating genetic profile frequency are not generally accepted in the scientific community as is required under Frye. Therefore, he argues, use of those methods in his case to calculate the frequency with which the crime sample of DNA appears in the population is inadmissible evidence. Copeland also raises a number of other challenges to the FBI procedures and population databases.
Human genes, the fundamental units of heredity, are made up of deoxyribonucleic acid (DNA). The DNA molecule consists of a long string of repeating units, nucleotides, in two strands resembling a spiral staircase (a double helix). The nucleotides, which are of just four types, are paired across the two strands in complementary sequence (they will only pair in certain combinations). Except for identical twins, the complete sequence of base pairs in the DNA is unique for every person. Most of human DNA is the same from person to person, but a very small percentage differs from person to person. The differences are polymorphisms, and are the key to DNA typing. One type of polymorphism consists of variations in the length of DNA at specific locations (loci) consisting of short repeating DNA sequences called VNTRs (variable number of tandem repeats). The physical length of the *1316 DNA molecule at these loci depends upon the number of short repeating sequences. In the human population there are many versions of the DNA at a specific locusthese are called alleles. VNTRs are examined (typed) by the RFLP technique (restriction fragment length polymorphism analysis). If a suspect's blood sample is found to "match" that of a forensic sample, then mathematical and statistical methods are used to estimate the frequency of the genetic profile in major population groups.[1]
After Copeland's trial, this court addressed some issues of admissibility of RFLP typing in a criminal case. State v. Cauthron, 120 Wash.2d 879, 846 P.2d 502 (1993). The court in Cauthron relied considerably upon conclusions drawn by a "committee of eminent scientists and jurists" (the Committee) which had researched and analyzed the status of forensic DNA typing under the auspices of the National Academy of Sciences. Committee on DNA Technology in Forensic Science, DNA Technology in Forensic Science (National Academy Press 1992) (DNA Technology). The court held that the theory underlying RFLP typing was generally accepted in the relevant scientific community. Cauthron, 120 Wash.2d at 895-99, 846 P.2d 502. The court also held that any remaining questions about the reliability of particular tests should be examined under standards for admissibility of expert testimony, which is within the trial court's discretion. Id. at 898, 846 P.2d 502.
The court then addressed admissibility of the statistical evidence. Without introducing any evidence of population statistics or the frequency of genetic profiles, the State's experts testified that defendant Cauthron's DNA "matched" the forensic sample. Id. at 906, 846 P.2d 502. This court ruled this testimony was improperly admitted because the jury was not informed of a scientifically valid estimate of the frequency with which matches might occur by chance. Id. at 906-07, 846 P.2d 502 (quoting Commonwealth v. Curnin, 409 Mass. 218, 565 N.E.2d 440 (1991)); Ex Parte Perry, 586 So.2d 242, 254 (Ala.1991); DNA Technology, at 74; see also Springfield v. State, 860 P.2d 435, 448 (Wyo. 1993); Nelson v. State, 628 A.2d 69, 75-76 (Del.1993); Taylor v. State, 889 P.2d 319, 337 n. 80 (Okla.Crim.App.1995).
The court unanimously held that the methodology underlying the probability estimates must satisfy the Frye standard.[2] The court concluded that the State failed to present any evidence of population statistics supporting its experts' testimony that defendant's DNA "matched" that of the forensic sample. Cauthron, 120 Wash.2d at 906, 846 P.2d 502. The court held that the testimony should not have been admitted, because it did not meet the test for expert testimony, which required satisfaction of the threshold Frye requirements and the 2-part test of ER 702. Id. The court concluded: "Testimony of a match in DNA samples, without the statistical background or probability estimates, is neither based on a generally accepted scientific theory nor helpful to the trier of fact." Id. at 907, 846 P.2d 502 (emphasis added).
The court observed, however, that the Committee which prepared DNA Technology set out a method for estimating population frequencies called the ceiling principle and said adoption of the ceiling principle by the Committee indicated sufficient acceptance within the scientific community to satisfy Frye. Id. at 908, 846 P.2d 502.
Cauthron thus decided some key issues relevant to Copeland's case. First, the methodology underlying RFLP typing is generally accepted by the scientific community and admissible under Frye. Second, statistical evidence of genetic profile frequency *1317 probabilities must be presented to the jury. Third, the methodology underlying the probability estimate must satisfy the Frye standard. Fourth, Cauthron directs that a number of issues raised by the defense are matters of weight and admissibility under ER 702, and not admissibility under Frye, as discussed further below. Finally, Cauthron approved the ceiling principle (modified, or "interim," ceiling principle).[3]
However, while the court approved the ceiling principle, it has not foreclosed use of other statistical models provided they are accepted in the scientific community. State v. Buckner, 125 Wash.2d 915, 919, 890 P.2d 460 (1995).
With this background, Copeland's challenges are addressed under the Frye standard for admissibility.
Copeland maintains that use of the "product rule" for calculating genetic profile frequency is not generally accepted in the scientific community.[4] Briefly restated, the product rule (or "multiplication rule") as applied in RFLP typing means that the probability of a genetic profile occurring in the population is the product of the probabilities of each individual allele's occurrence in the population. Validity of the rule depends upon whether the individual alleles are actually statistically independent. Cauthron, 120 Wash.2d at 901, 846 P.2d 502 (citing DNA Technology, at 76). Two assumptions underlie use of the product rule when calculating genetic profile frequencies: linkage equilibrium, which means that the alleles at different loci are inherited independent of each other, and Hardy-Weinberg equilibrium, which means that one allele at a locus is not predictive of the other allele at that locus (one allele is inherited from the mother, the other from the father). Hardy-Weinberg equilibrium depends upon an assumption of a large population in which there is random mating. See Cauthron, 120 Wash.2d at 902, 846 P.2d 502; Howard Coleman & Eric Swenson, DNA in the Courtroom: A Trial Watcher's Guide 124 (1994). The Committee reported in 1992 that substantial controversy arose about the adequacy of population databases used to calculate frequency estimates and about the role of racial and ethnic origin in the frequency estimation. DNA Technology, at 74-75, quoted in Cauthron, 120 Wash.2d at 902-03, 846 P.2d 502. Potential problems could result from "genetic drift" resulting in small populations having distinct genetic differences, too small a database, lack of randomness of the samples, and most importantly, lack of a truly mixed population such that each locus is in Hardy-Weinberg equilibrium as well as linkage equilibrium. Id. at 903, 846 P.2d 502.
When we decided Cauthron some scientific literature supported the view that there were statistically significant deviations from Hardy-Weinberg equilibrium, indicating the presence of genetically distinct subgroups in Caucasian, black, and Hispanic groups. Cauthron, 120 Wash.2d at 904, 846 P.2d 502 (citing, among others, R.C. Lewontin & Daniel L. Hartl, Population Genetics in Forensic DNA Typing, Science, Dec. 20, 1991, at 1745, 1747). However, other literature disputed early conclusions that the possibility of substructuring in major population groups was statistically significant. E.g., Ranajit Chakraborty & Kenneth K. Kidd, The Utility of DNA Typing in Forensic Work, Science, Dec. 20, 1991, at 1735. A number of courts concluded that in light of the scientific disagreement, there was a lack of general acceptance of use of the product rule to estimate genetic profile frequencies, and accordingly such calculations were not admissible. Cauthron, 120 Wash.2d at 905, 846 P.2d 502 (citing cases).
We concluded in Cauthron that use of product rule for this purpose was not generally accepted because of concerns that substructuring in human populations undercut certain assumptions underlying use of the rule. Our decision was heavily influenced by *1318 recognition of the Committee that there was a significant dispute among the scientists. The question here is whether the evidence in this post-Cauthron/Frye hearing, the literature, and the case law from other jurisdictions shows that use of the product rule now has sufficient general acceptance that it is admissible under Frye for calculating statistical frequencies of genetic profiles from RFLP typing results.
State's experts at the Frye hearing in this case included Dr. Bruce Weir, a professor of mathematics, statistics and genetics, Dr. Ranajit Chakraborty, a preeminent expert in statistics and human genetics, with over 20 years of study involving human DNA and genetics, Dr. Richard Gelinas, a molecular biologist, and Dr. Ellen Wijsman, a population geneticist. State's experts did not dispute that substructuring exists, but concluded it is statistically insignificant because empirical studies have shown the databases were nonetheless sufficiently in Hardy-Weinberg equilibrium and linkage equilibrium so that substructuring did not improperly affect calculations using the product rule.
Defense experts, Dr. Laurence Mueller, a population geneticist, and Dr. Seymour Geisser, a statistician, disputed these conclusions.
The trial court found:
This process of multiplication, known as the "product rule," is valid if each band (or bin) is independent of the others. That the frequencies of independent events may be multiplied to determine the frequency of their simultaneous occurrence is a universally accepted principle of statistics. Although various experts have raised theoretical objections to the use of the product rule with RFLP data, those experts who have analyzed the data agree that there is no evidence of dependence between the alleles, defined as fixed bins, used by the FBI. Indeed, the testimony, published work, and analysis performed in this case by Ranajit Chakraborty, Bruce Weir, and Ellen Wijsman prove that independence between alleles defined as fixed bins is a valid assumption. The defense presented no evidence that the assumption of independence was invalid. (Dr. Mueller's testimony was neither persuasive nor credible.)[[5]]
Clerk's Papers at 677-78. Our review is de novo and we are do not defer to the trial court's finding that the product rule is generally accepted. However, we have extensively reviewed the Frye hearing in this case, and we reach the same conclusion as the trial court did.
Although at one time a significant dispute existed among qualified scientists, from the present vantage point we are able to say that the significant dispute was short-lived. Cauthron was decided while the dispute raged; since that time additional empirical studies have been conducted, the FBI has collected data from around the world, and one of the most vociferous opponents of use of the product rule has joined with an FBI scientist in declaring that the DNA wars are over.
As mentioned, the FBI conducted a world wide study of VNTR frequency data from around the world. Laboratory Div., FBI, U.S. Dep't of Justice, VNTR Population Data: A Worldwide Study (Feb.1993). The study concluded, at page 2,
1) that there are sufficient population data available to determine whether or not forensically significant differences might occur when using different population databases; 2) that subdivision, either by ethnic group or by U.S. geographic region, within a major population group does not substantially affect forensic estimates of the likelihood of occurrence of a DNA profile; 3) that estimates of the likelihood of occurrence *1319 of a DNA profile using major population group databases (e.g., Caucasian, Black, and Hispanic) provide a greater range of frequencies than would estimates from subgroups of a major population category; therefore, the estimate of the likelihood of occurrence of a DNA profile derived by the current practice of employing the multiplication rule and using general population databases for allele frequencies is reliable, valid, and meaningful, without forensically significant consequences; and 4) that the data do not support the need for alternate procedures, such as the ceiling principle approach....
Other studies have similarly concluded that differences of allelic distribution is not forensically significant. E.g., Bruce Budowle et. al., The Assessment of Frequency Estimates of Hae III-generated VNTR Profiles in Various Reference Databases, 39 J. of Forensic Sciences 319 (Jan.1994); Bruce Budowle et. al., Evaluation of Hinf I-generated VNTR Profile Frequencies Determined Using Various Ethnic Databases, 39 J. of Forensic Sciences 988 (July 1994); Shui Tse Chow et. al., The Development of DNA Profiling Database in an HAE III Based RFLP System for Chinese, Malays, and Indians in Singapore, 38 J. of Forensic Sciences 874 (July 1993).
Extensive literature in peer reviewed journals indicates that substructuring does not have much impact on DNA population frequency estimates. See People v. Marlow, 43 Cal.App.4th 1440, 41 Cal.Rptr.2d 5, 33 (citing a number of articles, including several submitted as exhibits in Copeland's Frye hearing), review granted, 43 Cal.Rptr.2d 679, 899 P.2d 65 (1995) (California rules provide that once review is granted, an opinion may not be cited as legal authority).
As noted, a former opponent of use of the product rule has changed position. In 1994, Dr. Eric Lander co-authored an article with Bruce Budowle, declaring "[t]he DNA fingerprinting wars are over." Eric S. Lander & Bruce Budowle, DNA Fingerprinting Dispute Laid to Rest, Nature, Oct. 27, 1994, at 735. Dr. Lander's opinions were extensively relied upon by this court in its decision in Cauthron.
Lander and Budowle approved use of the Committee's ceiling principle, calling it "unabashedly conservative...." Lander & Budowle at 736. They stated: "[s]ome of the statistical power was sacrificed to neutralize all possible worries about population substructure." Id. They also wrote that the Committee's report, however, "failed to state clearly enough that the ceiling principle was intended as an ultra-conservative calculation, which did not bar experts from providing their own `best estimates' based on the product rule." Id. at 737 (Dr. Lander was a member of the Committee). They noted that the FBI's population surveys
yielded a remarkable database for examining allele frequency variation among ethnic groups. Reassuringly, the observed variation is modest for the loci used in forensic analysis and random matches are quite rare, supporting the notion that the FBI's implementation of the product rule is a reasonable best estimate.
Id. at 738.
Other courts have begun to take notice of the FBI's worldwide study, the numerous empirical studies reported, and the Lander & Budowle article, and have recognized, as we do, that the significant challenges to use of the product rule have been sufficiently resolved. See, e.g., Lindsey v. People, 892 P.2d 281 (1995); Armstead v. Maryland, 342 Md. 38, 673 A.2d 221 (1996); People v. Chandler, 211 Mich.App. 604, 536 N.W.2d 799 (1995).
We are aware that unanimity does not exist. However, we have not held that unanimity among scientists is required before we will find general acceptance in the relevant scientific community. We conclude that use of the product rule in establishing statistical probabilities of a genetic profile frequency in the human population is generally accepted within the relevant scientific community and that a significant dispute no longer exists on this matter.
Copeland next maintains that the FBI fails to follow recommendations by the Committee regarding standards and controls for running its laboratory and procedures, and that laboratory error rates should be part of the calculations for estimating population frequencies of genetic profiles. He argues *1320 these matters concern admissibility under Frye.
We have already held, however, that laboratory error is a matter of weight and not admissibility under Frye. See State v. Kalakosky, 121 Wash.2d 525, 540-41, 852 P.2d 1064 (1993); Cauthron, 120 Wash.2d at 890, 898, 846 P.2d 502; accord, e.g., State v. Alt, 504 N.W.2d 38, 48 (Minn.Ct.App.), review granted in part on other grounds and remanded, 505 N.W.2d 72 (Minn.1993). Under ER 702, if the lab error or error rates are so serious that results are not helpful to the jury, the trial court may in its discretion rule the evidence inadmissible. Kalakosky, 121 Wash.2d at 541, 852 P.2d 1064.
Moreover, laboratory error rate is not appropriately a part of the probability calculations. While the Committee in DNA Technology, at 88, noted that early in the application of DNA typing, nonblind proficiency studies suggested a high rate of false positives, the Committee said that "[c]oincidental identity and laboratory error are different phenomena, so the two cannot and should not be combined in a single estimate." DNA Technology at 88.[6] The Committee suggested, though, that error rates should be told to the jury. DNA Technology at 89. The Committee also recommended a number of guidelines for quality assurance in testing laboratories, including external blind proficiency testing of analysts and compliance with laboratory accreditation standards.
Here, FBI Agent Wick's testimony established that the FBI analysts were subjected to internal blind proficiency tests; however, no external testing was done. He testified that a "no error rate" was acceptable, and that no errors occurred during proficiency tests. Defense experts criticized the proficiency testing as being too simplistic and not representative of true forensic sample testing.
While a completely independent audit may be ideal, there was no evidence that the FBI procedures compromised the test results in this case. See Alt, 504 N.W.2d at 48. Further, issues of laboratory error and lack of proficiency testing can be and were the subject of cross-examination and defense expert testimony at Copeland's trial.
Finally, although the defense claimed that the FBI denied access to its databases, thus precluding others from assessing them, defense experts here had access to the databases.
Having reviewed the record, we hold that the trial judge did not abuse his discretion in admitting the DNA evidence despite complaints about quality assurance and error rates. The defense was able to present its evidence to the trier of fact, and there is no suggestion in this case of procedures so poor that the results of the typing would not be helpful to the trier of fact.
Copeland argues that the databases used by the FBI were not large enough to justify admissibility of the FBI's probability estimates. Estimates of the frequency of a particular allele require a representative database of the population. It is important that a population database be large enough to enable calculation of valid frequency estimates, and that it be representative of the relevant population.[7] The Committee authoring DNA Technology concluded, however, that "[d]etermining whether an allele has especially high frequency does not require a very large sample. A collection of 100 randomly chosen people provides a sample of 200 alleles [there are two at each locus], *1321 which is quite adequate for estimating allele frequencies." DNA Technology at 84; see also Ranajit Chakraborty, Sample Size Requirements for Addressing the Population Genetic Issues of Forensic Use of DNA Typing, Human Biology, Ap.1992, at 141; see also Ian W. Evett & Peter Gill, A Discussion of the Robustness of Methods for Assessing the Evidential value of DNA Single Locus Profiles in Crime Investigations, Electrophoresis 226 (1991) (concluding that about 110 individuals are needed to make up a database). In Cauthron, the court viewed the Committee's conclusions as those generally accepted in the scientific community.
We conclude that questions about the size of the database go to weight and admissibility under ER 702, and not admissibility under Frye. See Cauthron, 120 Wash.2d at 889, 846 P.2d 502. If the principle that frequency calculations can be made from an adequate database is generally accepted, then whether the particular database is large enough is a question of application of the science to the particular case, i.e., a matter of weight. See, e.g, Lindsey v. People, 892 P.2d 281, 292-93 (Colo.1995). The trial judge did not abuse his discretion in permitting testimony based upon the FBI databases despite Copeland's claims they are too small. Copeland's experts were able to present their views about the size necessary for an adequate database to the trier of fact.
Copeland claims the samples in the FBI database were not randomly collected and therefore are not representative of the relevant population.[8] Again, this is a matter of weight and admissibility under ER 702, and not admissibility under Frye. See Cauthron 120 Wash.2d at 889-90, 846 P.2d 502; Lindsey, 892 P.2d at 292-93. Although defense and State experts disputed the randomness of samples in this case, each side was able to present an opinion on this issue. The trial judge did not abuse his discretion in admitting the DNA evidence despite Copeland's challenges to the randomness of the database blood samples.
Copeland also challenges the quality of the FBI databases.[9] The complaints about the quality of the databases are also matters of weight and admissibility under ER 702, and not of admissibility under Frye. See Cauthron. There was ample evidence that the databases actually used to calculate the frequencies were not so compromised that the evidence was not helpful to the trier of fact. The defense experts were able to vigorously challenge the quality of the databases. We find no abuse of discretion.
Next, relying on conclusions in DNA Technology, at 52-54 (and other literature to the same effect), Copeland argues that transfer of DNA technology from medical diagnostic use to forensic use is problematic. The State does not dispute that differences exist, but argues that these are matters of weight and not admissibility. Cauthron's approval of RFLP typing for forensic purposes indicates this is a settled issue. Moreover, the court there held that possible pitfalls of DNA testing, "such as degradation, starring, cross contamination, etc., and the lack of controls" are questions for the jury. Cauthron, 120 Wash.2d at 899, 846 P.2d 502. Similarly, in State v. Russell, 125 Wash.2d 24, 41, 50, 882 P.2d 747 (1994) (involving polymerase chain reaction (PCR) typing), cert. denied, ___ U.S. ___, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995), we reasoned that a court looks to acceptance not only in the forensic setting but to acceptance by the wider scientific community familiar with the theory and the underlying technique, and that problems arising particularly in the forensic setting bear on the question of reliability *1322 of the individual test at issue, and thus are matters of weight and not admissibility. Other courts have held problems attributable to forensic use go to weight, not admissibility. E.g., State v. Vandebogart, 136 N.H. 365, 616 A.2d 483, 492-93; see United States v. Porter, 618 A.2d 629, 634 (D.C.Ct.App.1992) (under pre-Daubert/Frye standard, general acceptance not premised solely on opinion of forensic scientists). We similarly conclude that challenges based upon these questions are matters of weight and admissibility under ER 702, and not admissibility under Frye.
In this case, several controls served to show that the forensic sample was not degraded or contaminated with multiple unknown sources. Several samples were subjected to testing using the same analytic gel, including known controls run in lanes of the gel alongside the samples. Also, the forensic sample included the victim's DNA as well as unknown source male DNA from sperm. Ms. Kizer's son was one of the suspects, and his DNA serves as another control, because half of the alleles of a child match that of the mother. Half of his bands indeed matched those of his mother. Given these controls, and others, the typing results in this case were helpful to the jury despite Copeland's claim that forensic use of DNA is problematic.
Copeland also challenges the FBI's use of "match" windows. The FBI declares a "match" of the suspect sample to the forensic sample when the suspect sample measures within plus or minus 2.5 percent of the forensic sample. Copeland maintains that this "match" window does not comply with standards recommended by the Committee in DNA Technology, particularly with respect to reproducibility. The analyst determining whether there is a match can override the computer's placement of the cursor in a band, if he or she judges the computer has misplaced it, for example, in a wide band. Copeland argues that the ability of the analyst to override the computer makes it possible for the analyst to make the band fall within the 5 percent "window." He argues that the phenomenon called "band shifting" can result in serious problems with interpretation, and thus with declaring a "match."
The Committee reported:
Because of the limited resolution, two samples from a single person will often lead to slightly different measurements.... To decide whether two samples match, each laboratory must have a match criterion. The match criterion should provide an objective and quantitative rule for deciding whether two patterns matche.g., all fragments must lie within 2 % of one another. When samples fall outside the match criterion, they should be declared to be "inconclusive" or "nonmatching."
The match criterion must be based on reproducibility studies that show the actual degree of variability observed when multiple samples from the same person are separately prepared and analyzed under typical forensic conditions.
DNA Technology at 61-62 (footnote omitted).
There was evidence presented that the FBI has engaged in reproducibility studies in defining its match window. See also exhibit 36, B. Allen Budowle et al., Fixed-Bin Analysis for Statistical Evaluation of Continuous Distributions of Allelic Data from VNTR Loci, for Use in Forensic Comparisons, 48 Am. J. Hum. Genetics 841 (1991). Copeland relies, however, on expert reports submitted in United States v. Yee, 134 F.R.D. 161 (N.D.Ohio 1991) which were admitted at the Frye hearing in Copeland's case (reports of Dr. Peter D'Eustachio, Dr. Paul Hagerman, and Dr. Daniel Hartl, exhibits 45, 47, and 48). These experts challenged the FBI validation research and said its conclusions were either groundless or wrong, and concluded the results reported could not be replicated.
We note that a number of appellate decisions have rejected challenges to the FBI match criterion or have held they go to admissibility or weight in an individual case. State v. Alt, 504 N.W.2d 38, 46 (Minn.Ct. App.), review granted in part on other grounds and remanded, 505 N.W.2d 72 (Minn.1993) (citing cases).
We conclude that whether the FBI studies are valid and reproducible is a matter *1323 going to weight rather than admissibility, given the Committee's approval of objective match criteria in general.
The same is true of Copeland's complaints about the analyst's ability to override the computer in placing the cursor at the center of a band. Clearly, if an analyst manually overrode the computer placement to a degree where a match was falsely obtained, defense counsel could challenge the declaration of a match. The resulting autorad is available for examination. Misplacement would be the type of human error going to weight, not admissibility. See State v. Kalakosky, 121 Wash.2d 525, 541, 852 P.2d 1064(1993). In this case, there was no challenge that the samples did not fall within the plus or minus 2.5 percent match window.
Finally, the Committee did not consider band shifting as a bar to RFLP typing.[10] The possibility of an erroneous match being declared because of band shifting is rare. Alt, 504 N.W.2d at 47 (citing DNA Technology at 2-11). More likely, band shifting would result in an exclusion clearing the suspect even if he is the source of the specimen. Howard Coleman & Eric Swenson, DNA in the Courtroom: A Trial Watcher's Guide 29, 48 (1994) (DNA in the Courtroom.) There is no evidence that band shifting occurred in this case, and the phenomenon goes to weight and not admissibility under Frye, since it involves the application of the typing procedure in a particular case.

SUFFICIENCY OF AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
Copeland maintains that Detective Himple omitted two critical facts in his affidavit in support of the warrant to search Copeland's person and seize hair, blood, and saliva samples. Copeland says that if the omitted information is added to the affidavit, the affidavit is insufficient to establish probable cause to believe that Copeland was involved in the murder, and therefore the trial court erred in denying Copeland's motion to suppress evidence obtained through execution of the warrant.
In order to prevail, Copeland must show that any omissions (1) were knowing and intentional, or reckless without regard for the truth, and (2) were material, that is, they were necessary to the finding of probable cause. State v. Gentry, 125 Wash.2d 570, 604, 888 P.2d 1105, cert. denied, ___ U.S. ____, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995); State v. Garrison, 118 Wash.2d 870, 872, 827 P.2d 1388 (1992) (quoting Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)). As to the first requirement, "`[a]llegations of negligence or innocent mistake are insufficient.'" Garrison, 118 Wash.2d at 872, 827 P.2d 1388 (quoting Franks, 438 U.S. at 171, 98 S.Ct. at 2684). As to the second, it is not enough that Copeland prove an intentional or reckless omission, he must show that probable cause to issue the warrant would not have been found if the omitted material had been included. Gentry, 125 Wash.2d at 604, 888 P.2d 1105. We conclude that the two omitted facts were not material and accordingly reject Copeland's challenge to the sufficiency of the affidavit.
The first fact omitted from the affidavit is that while Himple said that Copeland refused to consent to a request for blood and hair samples and became upset and aggravated at the police for making the request, Himple also said that another suspect, Ronald DePalm, cooperated fully by voluntarily giving blood and hair samples, but failed to inform the magistrate that DePalm cooperated only after consulting with an attorney. The second fact is that Himple failed to inform the magistrate that Jackie Sawyer, a witness who described a man in the vicinity of the victim's apartment, failed to pick Copeland's photograph out of a photo montage.
The affidavit in support of the search warrant is a 21 page document with 8 exhibits attached. It describes six suspects and their defenses and possible defenses. One of the *1324 suspects was DePalm, who lived in the same area as the victim. Himple averred that DePalm did not look like the person in Sawyer's composite, but did look like the person in Taff's composite, as did Copeland. Himple stated, however, that DePalm had an alibi as to his whereabouts on May 18 and 19. The affidavit explained that both Taff and Sawyer were positive that DePalm was not the man they had seen; each positively eliminated him after being shown a photo line-up with DePalm's photo included.
The affidavit concludes with a summary noting that of the six suspects, only two resembled Taff's composite, and of these, only Copeland could be placed near the scene of the crime. It says:
In addition, William COPELAND is known to have been drinking alcohol during that same time span. He is also known to behave violently after he consumes alcohol and he has a violent criminal background. He admits that he knew Mary Jo KIZER and had prior contacts with her. He has changed his story about his whereabouts only after it was indicated to him that a witness might be able to identify him as being near the KIZER residence. It is believed that he owns a tan khaki shirt but showed Kent Detectives a different shirt when asked about the clothing he was wearing that morning.
CP at 426-27. Each of these statements is supported by information set forth in the affidavit.
The affidavit establishes that whether or not DePalm "fully cooperated," there was probable cause for issuance of the warrant to obtain biological samples from Copeland.
As to the second omitted fact, as the information in the affidavit makes clear, Sawyer did not see Copeland. Accordingly, her failure to pick Copeland out of a photo montage adds nothing which was not already apparentthe person she saw was not Copeland.
Neither omitted fact was material, and the trial court therefore did not err in denying the motion to suppress.

FAILURE TO PRESERVE REMAINING DNA
FBI Agent Vick followed FBI policy and discarded the remainder of DNA extracted from the crime sample after it was subjected to DNA testing. Copeland maintains that the failure to preserve the remaining extracted DNA violated the due process clauses of both the state and federal constitutions. However, his argument primarily is that a different constitutional test applies under the state constitution than under the federal constitution; he urges the court to reject the federal test stated in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) regarding preservation of evidence. Copeland's opening brief was filed before this court decided State v. Wittenbarger, 124 Wash.2d 467, 880 P.2d 517 (1994). There, we held that under Const. art. I, § 3, Youngblood provides the proper constitutional standard for preservation of potentially exculpatory evidence. Wittenbarger, 124 Wash.2d at 481, 880 P.2d 517.
The government's failure to preserve material exculpatory evidence requires dismissal of the charges against the defendant. Id. at 475, 880 P.2d 517. "[M]aterial exculpatory evidence" is evidence which possesses an "exculpatory value that was apparent before it was destroyed," and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 475, 880 P.2d 517 (citing California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984)). "A showing that the evidence might have exonerated the defendant is not enough." Wittenbarger, 124 Wash.2d at 475, 880 P.2d 517. Under the Due Process Clause as interpreted in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the good or bad faith of the State is irrelevant when the State fails to disclose to the defense material exculpatory evidence. Youngblood, 488 U.S. at 57, 109 S.Ct. at 337.
In contrast, where potentially useful evidence is concerned, as opposed to material exculpatory evidence, no denial of due process will be found unless the defendant shows bad faith on the part of the police. Id. at 58, 109 S.Ct. at 337.
*1325 The remaining extracted DNA clearly did not possess an exculpatory value apparent on its face. Also, as the trial court correctly concluded, there was no evidence that any retest results would have been exculpatory. Moreover, even if the discarded remainder had been exculpatory on its face, Copeland had comparable evidence to test. As the trial court found, and Copeland does not dispute the findings, the FBI preserved both the vaginal wash and the nylon membrane which included the DNA used in the RFLP procedure. Discarding the remaining DNA did not involve unconstitutional destruction of material exculpatory evidence.
Turning to the question whether the discarded DNA was potentially exculpatory evidence, the trial court found that "[i]t is the FBI policy to discard any remaining extracted DNA after completing their tests and writing a report." CP at 683. The court concluded "[t]he FBI did not act in bad faith when it combined the two vaginal swabs and when it discarded the remaining extracted DNA." CP at 685. Copeland has not assigned error to this finding or conclusion. Copeland's failure to assign error means that the issue of good faith or bad faith of the government need not be considered. See RAP 10.3(a)(3); State v. Hubbard, 103 Wash.2d 570, 574, 693 P.2d 718 (1985). We note, though, that this court has found compliance with established policy to be determinative of good faith, State v. Ortiz, 119 Wash.2d 294, 831 P.2d 1060 (1992), cited in Wittenbarger, 124 Wash.2d at 477, 880 P.2d 517, and Copeland has not convinced us that the FBI's established policy itself constituted bad faith.
We hold that due process was not violated as a result of the FBI's failure to preserve the remaining DNA extracted from the crime scene sample.

MOTION TO SUPPRESS BASED ON ALLEGED VIOLATION OF CRR 3.1 RIGHT TO COUNSEL
Copeland argues that when the officers took him to the Kent City jail on July 26, 1990, and took blood and hair samples from him pursuant to the search warrant authorizing the seizure of such samples, he was denied his right to counsel under CrR 3.1[11] and the evidence should be suppressed. The trial court, assuming that the right to counsel was violated, held that the evidence was not tainted by the violation.
Under CrR 3.1(a), "[t]he right to [counsel] shall extend to all criminal proceedings for offenses punishable by loss of liberty...." CrR 3.1(b)(1) provides that "[t]he right to [counsel] shall accrue as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest."
The parties dispute whether there were any "criminal proceedings" giving rise to a right to counsel within the meaning of CrR 3.1(a), whether Copeland was taken into "custody" within the meaning of CrR 3.1(b)(1), and whether suppression of the evidence is the appropriate remedy for any violation of the CrR 3.1 right to counsel in this case.
The State argues that criminal proceedings have begun only if the defendant has been arrested, and it intends to charge him with a crime. The State argues in this case that Copeland was temporarily detained solely to permit execution of the warrant. The State agrees, though, that Copeland was taken into "custody." Br. of Resp't at 11.
CrR 3.1(b)(1) says the right to counsel "shall accrue as soon as feasible after the defendant is taken into custody...." CrR 3.1(c)(1) states that "[w]hen a person is taken into custody that person shall immediately be advised of the right to [counsel]...." CrR 3.1(c)(2) states that "[a]t the earliest opportunity a person in custody who desires [counsel] shall be provided access to a telephone...." CrR 3.1(b) and (c) clearly contemplate that if Copeland was in custody, the right to counsel arose. CrR 3.1(a) is not contrary. Its aim is not so much to define when the right accrues but to explain that all criminal proceedings are encompassed by the rule: "The right to [counsel] shall extend to all criminal proceedings for offenses punishable *1326 by loss of liberty regardless of their denomination as felonies, misdemeanors, or otherwise." CrR 3.1(a). CrR 3.1 does not support the State's argument that "criminal proceedings" begin only when a defendant is arrested with the intent to charge him for a crime. See Heinemann v. Whitman County, 105 Wash.2d 796, 718 P.2d 789 (1986) ("custody" under former JCrR 2.11(b)(1) which provided that the "right to counsel shall accrue as soon as feasible after the defendant is taken into custody" same as for Miranda purposes). When Copeland was handcuffed and taken to the Kent City jail where the samples were taken, his freedom of movement was restricted. State v. Sargent, 111 Wash.2d 641, 648-49, 762 P.2d 1127 (1988) ("freedom of movement" is determinative of "custody" for Miranda purposes).
Where there is a violation of the court rule right to counsel, the remedy is suppression of evidence tainted by the violation. State v. Schulze, 116 Wash.2d 154, 804 P.2d 566 (1991). The trial court ruled that the blood and hair samples were not tainted by any violation of the right to counsel. Copeland maintains, however, that the evidence was tainted in two ways. First, he argues that if counsel had been afforded to him, counsel could have challenged the search warrant before the samples were taken.
In Schulze, the defendant was suspected of committing vehicular homicide while under the influence of intoxicants. He argued that he had a right to counsel under CrR 3.1 before submitting to a mandatory blood test. This court said that assuming that the court rule right to counsel had been violated, the blood test results were not tainted by the violation. The court reasoned that even if defendant had contacted his attorney, the attorney could have done nothing except advise defendant to submit to the mandatory testing. Schulze, 116 Wash.2d at 163-64, 804 P.2d 566. Similarly, in this case counsel could not have advised Copeland to refuse to give samples because the warrant was valid. Moreover, even if the warrant was invalid because not supported by probable cause, as Copeland argues, the evidence would be suppressed based upon lack of probable cause to issue the warrant. State v. Kalakosky, 121 Wash.2d 525, 536, 852 P.2d 1064 (1993). The right to counsel argument would be immaterial.
Copeland also claims that counsel could have attempted to obtain an order preventing the FBI from destroying the remainder of the DNA sample. The State aptly points out that the destroyed remainder was not from the blood drawn pursuant to the warrant. Thus, whether or not counsel could have obtained an order requiring preservation of the remaining DNA sample is a matter unrelated to evidence obtained from Copeland pursuant to the warrant.
The evidence obtained through execution of the search warrant was not tainted by the violation of the CrR 3.1 right to counsel, and thus the trial court properly denied the motion to suppress based upon an alleged violation of that right.

IMPROPER CROSS-EXAMINATION OF DEFENSE WITNESS
Copeland maintains that prosecutorial misconduct during cross-examination of a defense witness requires reversal of his conviction.
State's witness Raymond Counts, who was a fellow inmate of Copeland's in the King County jail, testified that Copeland confessed that "he had done his crime" but "didn't leave any witnesses." RP 4030-32. The defense called Orville Siemering, another King County jail inmate, to rebut Counts' testimony. Siemering testified that Copeland and Counts were not friends and that he had never seen Copeland confiding in Counts. He testified that Counts was not believable. On direct examination, Siemering's lengthy criminal history was elicited, including several assaults. During cross-examination, the prosecutor asked Siemering about his 1988 assault conviction: "You beat her [the victim, Siemering's wife] black and blue and you burned her abdomen with a cigar, didn't you?" RP 4651.
Under ER 609(a), cross-examination regarding prior convictions is limited to the fact of the conviction, the type of crime, and *1327 the punishment. State v. Coe, 101 Wash.2d 772, 776, 684 P.2d 668 (1984). "Cross examination exceeding these bounds is irrelevant and likely to be unduly prejudicial, hence inadmissible." Id. at 776, 684 P.2d 668. ER 609(a) applies to all witnesses. The prosecutor's question was improper.
In general, prosecutorial misconduct requires a new trial when there is a substantial likelihood that the misconduct affected the jury's verdict. State v. Belgarde, 110 Wash.2d 504, 508, 755 P.2d 174 (1988). The State maintains that Copeland cannot assert prejudice in light of the curative instruction given and the principle that a jury is presumed to follow instructions. However, the giving of a curative instruction does not end the inquiry. "`If misconduct is so flagrant that no instruction can cure it, there is, in effect, a mistrial and a new trial is the only and the mandatory remedy.'" Id. at 508, 755 P.2d 174 (quoting State v. Case, 49 Wash.2d 66, 74, 298 P.2d 500 (1956)).
Copeland argues that Siemering was a critical witness for the defense because if the jury chose to disregard his testimony, only Copeland's denial was left to rebut Counts' testimony that Copeland confessed to the crime. Copeland maintains that the prosecutor asked the question to suggest that Siemering was a gratuitously violent wife beater and to arouse the passions of the jury so that they would disregard Siemering's testimony.
The prosecutor's question was a deliberate attempt to influence the jury's perception of Siemering and his testimony, and constitutes prosecutorial misconduct. However, given the curative instruction and the circumstances, the misconduct was not so prejudicial that reversal is required. Both Counts and Siemering had extensive criminal histories about which the jury learned. Defense counsel's cross-examination showed that Counts' own extensive criminal history included violence. Cross-examination of Siemering revealed that he disliked Counts and that he was a small man who walked with a cane and slept in the bunk next to Copeland in the jail at the time he testified this testimony enabled the jury to infer that Siemering might fear Copeland, a much larger man.
While credibility is for the trier of fact, in light of all the jury learned about both these witnesses, we are not persuaded that the prosecutor's question so impassioned the jury that it would disbelieve Siemering and believe Counts. Further, the single question occurred during a lengthy trial; the trial court immediately sustained the defense objection to it and instructed the jury to disregard it The jury is presumed to follow instructions to disregard improper evidence. State v. Russell, 125 Wash.2d 24, 84, 882 P.2d 747 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995). Siemering never answered the question. In light of all the circumstances, the error resulting from the improper question was cured by the court's instruction. See id. at 84-85, 882 P.2d 747.

DIRECT EXAMINATION REGARDING IDENTI-KIT
Copeland maintains that the trial court erred in overruling his objection that there was inadequate foundation for the prosecutor's questioning of Detective Donald Winters as to estimates of the total possible combinations of faces possible using an Identi-Kit. Winters used an Identi-Kit when he met with witness Connie Taff to construct a composite of the facial features of the man she saw near the victim's residence. Winters estimated that the number of possible combinations of faces is in the millions, based upon the prosecutor's questions using the product rule. Later, the prosecutor moved to admit a diagram listing the number of choices for each of the facial characteristics Winters testified to. Next to the list were examples showing how the jury could use the "product rule" as it would apply to three different pairs of eyes and three different noses (to result in a total of nine possible combinations). Defense counsel objected to this exhibit on the grounds the figures were the prosecutor's and not the witness's, and no foundation had been laid. The objection was overruled and the exhibit was admitted for illustrative purposes.
Copeland contends the alleged errors invited the jury to apply the product rule to events which were not shown to be independent, *1328 thus prejudicially affecting Copeland's right to a fair trial.
"[T]here is no prohibition against using well-founded statistics to establish some fact that will be useful to the trier of fact." Russell, 125 Wash.2d at 70, 882 P.2d 747; State v. Briggs, 55 Wash.App. 44, 62-63, 776 P.2d 1347 (1989). The product rule is used to calculate the joint probability of a series of independent events as the product of the probabilities of each event, but it may not be used where there is no showing of the independence of the individual events. People v. Collins, 68 Cal.2d 319, 438 P.2d 33, 66 Cal.Rptr. 497, 36 A.L.R.3d 1176 (1968). However, there is a difference between calculating probabilities of events, which concern the likelihood of the result, and statistics which speak in terms of certitude, not likelihood. David McCord, A Primer for the Nonmathematically Inclined on Mathematical Evidence in Criminal Cases: People v. Collins and Beyond, 47 Wash. & Lee L.Rev. 741, 742 (1990).
Here, insofar as the prosecutor's question elicited an opinion as to the certain number of possible combinations of the Identi-Kit components, probabilities are not involvedthere is, in fact, mathematically a definite number of possible combinations, and it exceeds the "millions" response given by Detective Winters.
On the other hand, the prosecutor's questions and notations can be construed as inviting the jury to infer that the total number of combinations represents the total number of composites which could have resulted from Taff's observations of a man near the victim's residencethus leading to the inference that Copeland's resemblance to the Identi-Kit is an extremely rare event which identifies him as the person Taff saw. To the extent this inference was invited, it does involve an improper use of the product rule, because there was no showing that actual people's head hair, facial hair, skin tones, age lines, lips, nose, eyebrows, glasses, and so on, are truly independent of each other in the human population, in contrast to the possible combinations which can be made of the Identi-Kit components.
When estimates of statistical probabilities lack foundation and involve the identification of a defendant as the offender, convictions have been reversed in some cases. Collins, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33; Miller v. State, 240 Ark. 340, 399 S.W.2d 268 (1966); State v. Sneed, 76 N.M. 349, 414 P.2d 858 (1966). However, we conclude that error in this case, if any, was harmless. The composite did look like Copeland, and the jury could easily see that. Further, Taff identified Copeland in trial as the man she had seen to a "99 percent certainty." Within reasonable probabilities, the outcome of the trial was not affected by the alleged error. See State v. LeFever, 102 Wash.2d 777, 785, 690 P.2d 574 (1984), overruled on other grounds by State v. Brown, 113 Wash.2d 520, 782 P.2d 1013, 787 P.2d 905, 80 A.L.R.4th 989 (1989); State v. Robtoy, 98 Wash.2d 30, 44, 653 P.2d 284 (1982).

CHALLENGES TO STATE'S REBUTTAL WITNESS'S TESTIMONY
Copeland argues that he was denied his right to confront witnesses and present a defense as provided by the Sixth and Fourteenth Amendments and Const. art. I, § 22 (amend. 10) and his due process right to a fair trial when the trial court permitted State rebuttal witness Berch Henry to testify.
Henry was called as a rebuttal witness to rebut defense witnesses' testimony regarding interpretation of autorads and use of the counting rule. He also testified that he examined his own database to see if there were any matches with Copeland's profile. Defense counsel objected on the ground he had not been given access to Henry's database and he had not been told Henry would be a witness. The objection was overruled. Henry testified there were no matches. Defense counsel cross-examined Henry, eliciting that Henry had not released his data for peer review. The next day defense counsel argued he should be allowed to call a surrebuttal witness. The trial court required an offer of proof. Defense counsel stated his proposed witness would testify that he was aware of the database but that no one had access to it, that the data had not been subjected to peer review, and that tests done *1329 under the FBI protocol were inconclusive. The trial court disallowed the testimony because the proposed witness had no knowledge of the database and could only provide general testimony about the FBI and other witnesses who had testified to these matters.
The question of admissibility on rebuttal is largely within the discretion of the trial court. State v. Swan, 114 Wash.2d 613, 653, 790 P.2d 610 (1990) (quoting State v. White, 74 Wash.2d 386, 394-95, 444 P.2d 661 (1968)), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). Here, the trial court did not abuse its discretion in permitting Henry to testify about matters raised by the defense. A defense witness advocated use of the "counting rule" and testified about it. Henry testified to results using the counting rule and his database. Other testimony by Henry was clearly in response to new matters.
Nor did the trial court abuse its discretion in concluding that the proposed surrebuttal witness would be unable to rebut the new matters raised by Henry's testimony. Further, although Copeland argues that he was unable to file a motion for court-ordered access to the database, he failed to request a continuance to seek such a court order. Accordingly, the trial court did not abuse its discretion in rejecting the proposed testimony.
Copeland claims that Henry was known to the State months before his testimony, and that the State failed to provide notice that he would be called as a witness. We conclude that Henry was a genuine rebuttal witness whom the State did not need to disclose in advance of trial. Swan, 114 Wash.2d at 654, 790 P.2d 610 (citing White, 74 Wash.2d 386, 444 P.2d 661).
Copeland's constitutional challenges are without merit. He was not denied his right to confront Henry, and indeed engaged in extensive cross-examination of him which disclosed the limitations of his database and the fact his raw data was not available for review. He also was not denied the right to present a defense. He was not able to persuade the judge that his surrebuttal witness would provide any testimony which had not already been presented, and the judge did not abuse his discretion in refusing to allow a witness to testify who would add nothing. He did not ask for a continuance to pursue the matter further.
Copeland also argues that he was denied a fair trial because Henry testified that he found no match between Copeland's genetic profile and that of 7611 samples in his database, but Copeland did not have access to the database. He argues this testimony was prejudicial because the jury would conclude on this basis and other tainted evidence in the case that Copeland committed the crime. We disagree. Copeland's counsel's cross-examination revealed possible limitations in use of the database. Moreover, we have held that probability estimates based on use of the product rule are admissible. In light of probability estimates in the millions, we fail to see how a 1 in 7611 probability of a random match in the population could have been prejudicial.

CLOSING ARGUMENT
Copeland argues that reversible error occurred during closing argument because the prosecutor argued that Copeland had lied to the police and to the jury, and because the prosecutor improperly relied upon the "product rule" during closing argument.
Copeland did not object to the allegedly improper argument or request a curative instruction. "[U]nless prosecutorial conduct is flagrant and ill-intentioned, and the prejudice resulting therefrom so marked and enduring that corrective instructions or admonitions could not neutralize its effect, any objection to such conduct is waived by failure to make an adequate timely objection and request a curative instruction." Swan, 114 Wash.2d at 661, 790 P.2d 610 (citing State v. Charlton, 90 Wash.2d 657, 661, 585 P.2d 142 (1978)); see State v. Belgarde, 110 Wash.2d 504, 507, 755 P.2d 174 (1988).
Where the prosecutor during closing argument gives a personal opinion on the credibility of witnesses, misconduct occurs. Swan, 114 Wash.2d at 664, 790 P.2d 610; State v. Reed, 102 Wash.2d 140, 145, 684 *1330 P.2d 699 (1984). "However, prejudicial error does not occur until it is clear that the prosecutor is not arguing an inference from the evidence, but is expressing a personal opinion." Swan, 114 Wash.2d at 664, 790 P.2d 610. Thus, prosecutors may argue inferences from the evidence, including inferences as to why the jury would want to believe one witness over another. State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995), cert. denied, ___ U.S. ___, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). The same rule has been applied as to credibility of a defendant. In State v. Adams, 76 Wash.2d 650, 660, 458 P.2d 558, rev'd on other grounds by, 403 U.S. 947, 91 S.Ct. 2273, 29 L.Ed.2d 855 (1971), the prosecutor called the defendant a liar several times during closing argument. Each time, the prosecutor referred to specific evidence, including the defendant's own testimony, which "clearly demonstrated that in fact [the] defendant had lied." The court held that the argument fell within the rule allowing counsel to draw and express reasonable inferences from the evidence. Adams, 76 Wash.2d at 660, 458 P.2d 558. See also State v. Luoma, 88 Wash.2d 28, 40, 558 P.2d 756 (1977) (defendant argued that prosecutor's comments in closing argument to effect that defendant was a liar and he knew the jury would have the "guts" to do what they had to do were improper; court found support for statement in the evidence); State v. Jefferson, 11 Wash.App. 566, 524 P.2d 248 (1974) (court said prosecutor's use of word "liar" as a comment on defendant's credibility not improper where evidence showed defendant was not truthful).
Here, the prosecutor told the jury "you'll find as a jury that he lied when he took the stand...." RP 5861. He also suggested that Copeland was "lying" when Copeland described the route he took after leaving his former girlfriend's place the morning of the murder. The prosecutor said that Copeland lied to Detective Himple when he said he was wearing a brown shirt the morning of the crime (not a khaki shirt), that he lied when he testified that he showed the detective a khaki shirt, that he lied when he testified that tennis shoes and the khaki shirt were in his possession in his apartment when he was arrested and then later said they were taken to storage and lost, and that he lied in describing the sequence of events the morning Ms. Kizer was murdered. As to each of these matters, Copeland's explanation of events was contradicted by other witnesses.
Significantly, the prosecutor did not simply call Copeland a liar. Instead, his comments were related to the evidence and drew inferences that Copeland lied because his testimony conflicted with that of other witnesses. Like the cases cited above, there is evidence which supports the prosecutor's inferences that Copeland was not credible.
Copeland next argues that the prosecutor improperly relied on the product rule in closing argument, and improperly equated the probability of a series of events with the probability of mistaken identification. The prosecutor analogized the product rule to common sense and common experience. He explained the product rule to the jury, i.e., if two events are independent you multiply the frequencies of each together to obtain an estimate about the rarity of the events occurring together. He then described a hypothetical involving a little girl at an airport whose parents were searching for her. The parents were required to ask a series of questions to determine if their child had boarded a plane. The questions were whether there was a little girl on the plane, whether she had dark hair and dark skin, whether she had a certain dress on, whether she wore sunglasses, and whether she carried a certain kind of purse. The prosecutor said these characteristics were independent, assigned odds to each of the events, and then asked the jury what the chances were of all these events coming together, and answered one in a million.
The prosecutor then listed "circumstances" in this case which he suggested were rarer than wearing sunglasses, having dark hair and skin, or carrying a certain purse. He suggested six circumstances: the autorad for one of the loci tested in the RFLP DNA typing; Connie Taff's description of the man she saw near the victim's residence; the autorad for another of the tested loci; the pubic hair found on the victim's robe and in *1331 her hair; Copeland's statements to Himple and Counts; and the DNA evidence. The prosecutor did not assign frequency estimates to the evidence in the case or ask the jury to do so. He argued that the circumstances were not just bad luck on Copeland's part.
While the prosecutor did not assign probabilities to the events, his argument on the whole invited the jury to consider the possible rarity of each of the "circumstances" and then multiply them together, like the "circumstances" involving the hypothetical of the little girl on the plane to reach a conclusion that the odds of all the circumstances occurring together were extremely rare. Where the product rule is used, however, the events must be shown to be independent, and this record is devoid of foundation evidence establishing independence of these events. Further, the argument assumes, for example, that Connie Taff did in fact see a mulatto man, when she may have been mistaken in her identification. The product rule suggests an infallibility which is inappropriate where eye witness testimony is concerned and independence of events is not established. See Collins, 68 Cal.2d at 319, 66 Cal.Rptr. 497, 438 P.2d 33. The argument on the whole invited the jury to calculate that mistaken identification was an unlikely event.
We are aware that some courts have upheld use of the product rule in closing argument. E.g., Roach v. State, 451 N.E.2d 388 (Ind.Ct.App.1983); Pearson v. State, 811 P.2d 704 (Wyo.1991). However, a defendant is presumed innocent and the State has the burden of proving guilt beyond a reasonable doubt. We do not countenance use of a mathematical approach to the determination of guilt, and especially do not do so where, as in this case, there is no basis in the record for assuming independence of the events described by the prosecutor. See 1 McCormick on Evidence § 210, at 953-54 n. 13 (John W. Strong ed., 4th ed.1992) (closing argument involving multiplication of hypothetical probabilities likely to mislead the jury in the absence of careful explanation of the probability of a coincidental misidentification and the distinct probability the defendant left the incriminating traces).
However, while the prosecutor's argument in this case was improper, a curative instruction would have neutralized any prejudice. Accordingly, Copeland waived any error by failing to object and request a curative instruction.

MOTION FOR NEW TRIAL; CUMULATIVE ERROR
Copeland argues that the trial court abused its discretion by refusing to grant his motion for a new trial under CrR 7.6. He alleged several errors were grounds for a new trial, including admission of the DNA evidence, failure to suppress DNA evidence in light of destruction of the remaining extracted DNA, failure to suppress biological sample evidence due to denial of CrR 3.1 right to counsel, refusal to permit his calling of his proposed surrebuttal witness, and prosecutorial misconduct in cross-examination of Siemering.
The grant or denial of a motion for a new trial is within the sound discretion of the trial court and will be reversed only for abuse of that discretion. State v. Balisok, 123 Wash.2d 114, 117, 866 P.2d 631 (1994). Most of the claimed errors are not errors at all, as we have explained above, and such errors as occurred do not warrant a new trial. The trial court did not abuse its discretion in denying the motion for a new trial.
Copeland also argues that cumulative error denied him his right to a fair trial. See State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984). A new trial is not justified in this case on the basis of cumulative error.

EXCEPTIONAL SENTENCE
Copeland maintains that the trial court erred in imposing an exceptional sentence of 480 months. Based on an offender score of 4, the standard sentencing range was 281 to 374 months. RCW 9.94A.210 guides the trial court's determination to depart from the standard range.
The trial court entered the following findings of fact in support of the exceptional sentence as required by the statute:

*1332 1. The victim in this case, Mary Jo Kizer, suffered injuries too numerous to count, inflicted by the defendant.
2. As the medical examiner testified, these injuries included:
a) blunt impact trauma to the head, caused by repeated blows to her face, head, and neck;
b) broken bones and cartiledge in the neck, caused by manual strangulation;
c) broken ribs, caused by punches or kicks;
d) numerous deep stab wounds to the upper chest; three of these were lethal wounds;
e) defensive wounds, including contusions, abrasions, and incised wounds on her hands, fingers, arms, feet, and legs; and
f) patterned puncture wounds on the victim's back, thigh, and arm; these were inflicted with an instrument like a carving fork.
3. By their number, severity, and diversity, these injuries demonstrate violence for violence's sake.
4. As his victim lay bleeding to death, the defendant raped her.
5. The defendant's conduct toward the victim in this case exhibited deliberate cruelty.
6. This court is convinced, beyond a reasonable doubt that the defendant caused the victim's death with premeditated intent, and that the murder was committed in the course of and in furtherance of his rape (in the first degree) of the victim.
CP at 670-72. The court entered as a conclusion of law:
4. The sentence of 480 months is justified because the defendant's conduct toward the victim manifested deliberate, protracted cruelty: an aggravating circumstance.
CP at 672.
Copeland concedes that findings of fact 2(a) through (f) are supported by the medical examiner's testimony, and agrees that the circumstances of the crime were "very violent." Br. of Appellant at 101, 212. He does not challenge finding of fact 4. However, he challenges the trial court's finding that the injuries demonstrate violence for violence's sake, finding of fact 3, and that defendant's conduct exhibited deliberate cruelty to the victim, finding of fact 5. His challenge to the factual findings is reviewed under the "clearly erroneous" standard of review. State v. Solberg, 122 Wash.2d 688, 705, 861 P.2d 460 (1993). Copeland also challenges the trial court's conclusion of law that an exceptional sentence is warranted on the basis of deliberate cruelty. Copeland's challenge to whether the reasons justify a departure from the standard range is reviewed as a "matter of law." Id. at 705, 861 P.2d 460. Copeland does not argue that the length of the sentence is clearly excessive, if an exceptional sentence is warranted.
The Court of Appeals has said that "[d]eliberate cruelty consists of gratuitous violence or other conduct which inflicts physical, psychological, or emotional pain as an end in itself." State v. Scott, 72 Wash.App. 207, 214, 866 P.2d 1258 (1993), aff'd sub nom. State v. Ritchie, 126 Wash.2d 388, 894 P.2d 1308 (1995); see also State v. Strauss, 54 Wash. App. 408, 418, 773 P.2d 898 (1989). This court reasoned the aggravating factor involves "cruelty `of a kind not usually associated with the commission of the offense in question.'" State v. Crane, 116 Wash.2d 315, 334, 804 P.2d 10 (citation omitted), cert. denied, 501 U.S. 1237, 111 S.Ct. 2867, 115 L.Ed.2d 1033 (1991) (citing State v. Payne, 45 Wash.App. 528, 531, 726 P.2d 997 (1986)).
Copeland does not dispute that deliberate cruelty may justify an exceptional sentence.[12] Copeland relies instead upon the principle that the reasons for an exceptional sentence "must take into account factors other than *1333 those which are necessarily considered in computing the presumptive range for the offense." State v. Nordby, 106 Wash.2d 514, 518, 723 P.2d 1117 (1986). He maintains that considering the evidence necessary to prove each of the elements of the crimes of which he was convicted, specifically premeditation (first degree premeditated murder), and forcible compulsion and use of a deadly weapon (predicate felony for felony murder: rape in the first degree), the conduct in this case did not reach a level of cruelty which distinguishes it from other crimes in the same category.
We disagree. Copeland's conduct far exceeded what is required to establish premeditated murder and felony murder, with rape as the predicate felony. The murderer assaulted Ms. Kizer in at least two separate places in her apartment. At each location the force of the attack splattered blood on the walls of her home. The assailant struck her in the mouth and kicked her in the ribs, manually strangled her with such force that bones and cartilage in her neck were broken, and stabbed her, leaving gaping wounds in her chest. Copeland does not challenge the trial court's finding that each of the three knife wounds was a lethal wound. The murderer ripped an earring from Ms. Kizer's ear. As she bled to death, he raped her. He used an instrument like a barbecue fork to puncture her back, arm and thigh.
The strangulation, rape, multiple stab wounds, and stabbing with a fork, with attacks occurring in at least two locations in the victim's home, show a prolonged, exceedingly violent assault on the victim. The facts of this case establish conduct far exceeding that required for conviction of premeditated murder and felony murder.
The record and the law support the trial court's findings and the imposition of an exceptional sentence based upon deliberate cruelty.

CONCLUSION
The trial court did not err in holding the DNA evidence admissible under Frye, which remains the standard for admissibility of novel scientific evidence in this state. Because we hold that the product rule is generally accepted by the scientific community, trial courts can rely upon this determination as settling admissibility of this methodology in future cases. See State v. Cauthron, 120 Wash.2d 879, 888 n. 3, 846 P.2d 502 (1993). Only if a party presents new evidence seriously questioning continued general acceptance of use of the product rule will a Frye hearing be required. Id.
We affirm Copeland's conviction and exceptional sentence.
DOLLIVER, SMITH, GUY, JOHNSON and ALEXANDER, JJ., and PEKELIS, J. Pro Tem., concur.
TALMADGE, Justice, concurring.
I agree with the majority that we should adhere to the test articulated in Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.Cir.1923) for assessing the admissibility of expert opinion testimony where such testimony is based upon a novel scientific principle. I write separately to emphasize the Frye test applies only to the evaluation of novel scientific theories themselves, and not to differences of expert opinion as to how to apply such theories.
"In the past decade courts have faced the difficult task of ruling on the admissibility of evidence derived from a wide range of newly ascertained or applied scientific principles." Paul C. Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 COL. L. REV. 1197, 1198 (1980). The Frye test applies "in cases involving novel devices or processes, such as lie detectors, `truth serum,' identification by human bite marks, microscopic analysis of gunshot residue, and hypnosis." People v. McDonald, 37 Cal.3d 351, 690 P.2d 709, 724, 208 Cal.Rptr. 236, 46 A.L.R.4th 1011 (1984).
Thus, the focus of the admissibility question under Frye is on the general acceptability in the relevant scientific community of the new theory advanced. I believe our cases may have gone too far in requiring application of Frye to each and every forensic dispute in the application of a novel scientific theory.
*1334 We have said, "If there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted." State v. Cauthron, 120 Wash.2d 879, 887, 846 P.2d 502 (1993). See also State v. Buckner, 125 Wash.2d 915, 890 P.2d 460 (1995); State v. Russell, 125 Wash.2d 24, 882 P.2d 747 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995); State v. Kalakosky, 121 Wash.2d 525, 852 P.2d 1064 (1993). While this statement is correct in the context of a Frye evaluation, it goes too far when read out of context. It seems to imply, incorrectly, that any dispute between experts on any aspect of the forensic application of scientific theory is subject to Frye scrutiny. Thus, the majority here applies Frye to assess the admissibility of the "product rule" for calculating genetic profile frequency. The rules of evidence do not require such dissection.
In Cauthron, for instance, we held DNA typing was generally accepted in the scientific community and was therefore admissible as proof of guilt against the defendant. Cauthron, 120 Wash.2d at 899, 846 P.2d 502. The validity of DNA typing depends upon the then-novel scientific theory that DNA sequences are unique to each individual. We agreed with the theory, and thereby accepted DNA typing as evidence. We recognized, however, that significant scientific dispute abounded as to the proper handling of DNA samples:
While these problems are of concern, they do not require excluding the evidence altogether. Once the general underlying principles are accepted, as they are here, then both the proponents and opponents of a particular test should be able to garner the necessary information to present both sides of the issue to the factfinder. Any remaining questions about the reliability of the particular tests in this case should be examined under the standards of admissibility of expert testimony, which is within the trial court's discretion.... [W]e hold that the problems raised by the defense concerning the quality of the autorads in this case go to the weight rather than the admissibility of the testimony. Cauthron, 120 Wash.2d at 898-99, 846 P.2d 502.
Testimony about DNA found at a crime scene involves comparing the frequency of the defendant's DNA sequences with the frequency of naturally occurring sequences. This comparison requires use of a database to determine the frequency with which a particular genetic profile occurs in persons other than the defendant. Accordingly, DNA testimony may not be presented to the jury without an accompanying calculation of genetic profile frequency. Cauthron, 120 Wash.2d at 906, 846 P.2d 502.
Here, the State relied on the "product rule" and a particular FBI database to establish the genetic profile frequency. Copeland objects to the use of the product rule because he says it is not generally accepted in the relevant scientific community. The majority embarked upon a lengthy discussion of the product rule before concluding it passes the Frye test. Majority op. at 1317-20.
Such analysis was superfluous. There had been conflicting scientific testimony at the trial on the issue, and sufficient information for the jury to decide the matter based on the weight of the evidence. The various views on the applicability of the product rule did not involve questions of novel scientific theory, but rather involved disputed approaches to applying the theory. As we concluded in Cauthron, such questions go to the weight and not the admissibility of the evidence.
Notably, the majority opinion determines that questions about the size or representativeness of the particular database used for the estimate will go to weight and admissibility under ER 702, and not admissibility under Frye. Majority op. at 1321. "If the principle that frequency calculations can be made from an adequate database is generally accepted, then whether the particular database is large enough [or representative enough] is a question of application of the science to a particular case, i.e., a matter of weight." Majority op. at 1321. It would appear that questions of the applicability of the product rule calculation are also a matter of weight and not admissibility.
*1335 We must carefully delineate the boundaries of the Frye test so we do not subject each aspect of the forensic application of a novel scientific theory to its rigors. "Frye is not concerned with the acceptance of the results of a particular study or of the particular testing procedures followed in the case before the court." Russell, 125 Wash.2d at 51, 882 P.2d 747. Frye is applicable only to the question of whether a novel scientific principle or theory is generally accepted in the scientific community. Once the court, as a matter of law, determines after an appropriate hearing the acceptability of the principle or theory, the court must evaluate the extent to which the evidence applying the principle is admissible through the testimony of expert witnesses. ER 702. The jury, as the trier of fact, determines the weight of the evidence. State v. Lord, 117 Wash.2d 829, 854-55, 822 P.2d 177 (1991) ("expert's lack of certainty goes to the weight of the testimony, not its admissibility."), cert. denied, 506 U.S. 856, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992). Courts should guard against converting disputes between scientific experts into admissibility issues requiring Frye hearings, and allow juries to exercise their traditional roles as factfinders.
DURHAM, C.J., concurs.
NOTES
[1] The scientific explanation here is drawn primarily from Committee on DNA Technology in Forensic Science, DNA Technology in Forensic Science (National Academy Press 1992) (DNA Technology); Howard Coleman & Eric Swenson, DNA in the Courtroom: A Trial Watcher's Guide 29-42 (1994) (DNA in the Courtroom,) and State v. Cauthron, 120 Wash.2d 879, 891-895, 846 P.2d 502 (1993). See Cauthron for further explanation of the science underlying RFLP testing.
[2] We are aware that some courts have held that the statistical evidence of genetic profile frequency probabilities is a matter of weight for the trier of fact and not admissibility under Frye. E.g., United States v. Bonds, 12 F.3d 540, 564-65 (6th Cir.1993); Springfield v. State, 860 P.2d 435, 447 (Wyo.1993) (under Wyoming rules of evidence).
[3] For further discussion of the interim ceiling principle, see State v. Jones, 922 P.2d 806 (1996).
[4] The concurrence argues that this question does not involve a novel scientific theory. In its unanimous opinion in State v. Cauthron, 120 Wash.2d 879, 846 P.2d 502 (1993), this court applied the Frye test to use of the ceiling principle to determine genetic frequencies. We see no substantive difference between the nature of the inquiry here and that in Cauthron.
[5] As the State points out, Dr. Mueller's primary research has involved genetics in fruit flies. He had published little in the field of human genetics, only one non-peer reviewed chapter in a general text, had two papers in the area rejected, was uninformed of latest articles in the field, had misused a statistical model developed by Weir, had no graduate students working under him, had not received any awards in his field in over ten years, had not received a research grant in about eight years, and made about $100,000 testifying as an expert in 1990-91. Dr. Geisser was also unfamiliar with publications in the area. Although there is no doubt that Dr. Chakraborty is a leading expert in the field, Dr. Geisser was unfamiliar with his studies, and thought Chakraborty was "a guy in a lab somewhere."
[6] The National Research Council formed a new committee to update and clarify principles concerning population genetics and statistics as applied to DNA evidence. The new committee's prepublication report supports our holdings that use of the product rule is generally accepted in the scientific community for calculating frequency probabilities of a genetic profile occurring in human populations, and that laboratory error rates should not be used as part of the probability calculations. Committee on DNA Forensic Science: An Update, The Evaluation of Forensic DNA Evidence 3-9 to 3-11, 4-36 (National Academy Press 1996).
[7] The FBI's databases were generated by collection of blood samples from people in several racial populations. Report of Proceedings (RP) at 124. Agent Vick testified that the Caucasian database used in this case (C3) contained about 750 samples. RP at 1911. The black database consisted of about 500 samples. RP at 1908.
[8] The black database is made up of blood bank samples from California, Texas, and Florida. RP at 1908-10. The Caucasian database is made up of blood samples collected from FBI agents and samples from California, Texas and Florida. RP at 1911. State expert witnesses said that collecting samples from blood banks is a generally accepted method of developing a database.
[9] There is no dispute that when the FBI was building its database it contained duplicates. Further, some samples were originally labeled as Caucasian when they were black. Mueller said this compromised the integrity of the database. RP at 936-37. Defense expert Randall Libby, a molecular biologist, examined samples in the databases, and testified that the FBI often deleted a sample where confusion arose and that the interpretation of the autorads was subjective.
[10] "Band shifting" occurs when DNA has migrated at a different speed through the gel; for example, two DNA samples from one person could show different patterns. DNA Technology at 60.
[11] Copeland does not argue that he was denied any constitutional right to counsel.
[12] In deciding whether to impose an exceptional sentence a trial court may consider whether "[t]he defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim." RCW 9.94A.390(2)(a).