[No. 10797-3-III.   Division Three.   July 11, 1991.]

DEBORAH ELAINE STEFFEN, *Appellant*, v. THE
DEPARTMENT OF LICENSING, *Respondent*.

*Larry W. Larson,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *William R. Strange, Assistant,* for respondent.

THOMPSON, J.—Deborah Elaine Steffen appeals a superior court order affirming the revocation of her driver's license. Her license was revoked by the Department of Licensing for refusing to submit to a breath test. We affirm.

On the evening of January 22, 1989, Ms. Steffen drank alcohol in Yakima until she passed out. The next morning between 8:30 and 9, she drove to her father's Yakima home. She was hung over and asked her stepmother if she had anything she could take. Her stepmother told her she had aspirin in her medicine cabinet. Ms. Steffen took two pills

from the medicine cabinet, believing them to be aspirin. Her stepmother had a heart condition and kept her prescription medication in the same cabinet. It was not known what medication Ms. Steffen actually ingested.

Ms. Steffen left Yakima with her two children, intending to return to Moses Lake. She had nothing to eat or drink before leaving. She stopped at a restaurant in Vantage and drank a wine cooler while her children ate. Shortly after leaving Vantage, she felt sick and stopped. Her children got out of the vehicle.

Between 1:15 and 1:30 p.m., State Trooper Nettleton observed Ms. Steffen's vehicle alongside Interstate 90, approximately 6 miles east of George. The tires were spinning and she was trying to maneuver out of some ruts. Her two children were next to the vehicle trying to get the trooper's attention.

Ms. Steffen was getting out of her car as Trooper Nettleton approached. She was trying to get her children who started running toward him. He observed that her jeans were 7 to 8 inches below her waistline and her zipper was open. She could not keep her balance and had to hang onto the car whenever she took a step. He detected a strong odor of alcohol. She told him she had to get her children and had to use the rest room. When the trooper asked her how much she had to drink, she did not reply. She relieved herself and the trooper placed her under arrest.

Ms. Steffen was taken to the Grant County Jail, advised of her *Miranda* rights and advised and warned of her implied consent rights and consequences. The trooper began the necessary procedure to give Ms. Steffen a breath test. Ms. Steffen refused to take the test, however. The trooper prepared a sworn statement of refusal as required under RCW 46.20.308(6).

The Department of Licensing revoked Ms. Steffen's driver's license. She appealed to Grant County Superior Court and a de novo bench trial was held. Ms. Steffen argued she was incapable of refusing the breath test under

RCW 46.20.308(4).[1] The trial court disagreed. The revocation of Ms. Steffen's license was affirmed and the Department was awarded statutory attorney fees.

Ms. Steffen first contends there was insufficient evidence to support the trial court's finding that she was not unconscious as contemplated by RCW 46.20.308(4).

A person arrested for DWI is permitted to withdraw his or her implied consent to a chemical test for blood alcohol content after being fully advised of the consequences. RCW 46.20.308(5). However, a driver who is "dead, unconscious, or . . . otherwise in a condition rendering him or her incapable of refusal . . .", is deemed not to have withdrawn consent, and a blood test is to be administered. RCW 46.20.308(1), (2);[2] *Department of Motor Vehicles v. McElwain*, 80 Wn.2d 624, 627, 496 P.2d 963 (1972).

The meaning of "unconsciousness" was directly at issue in *Oaks v. Department of Licensing*, 31 Wn. App. 892, 645 P.2d 708 (1982).[3] The defendant in *Oaks* argued his level of intoxication had been so great he was rendered "unconscious". He asserted that a significantly diminished level of awareness or self–perception was sufficient and that a total lack of self–awareness was not required.

*Oaks* noted the term "'unconscious'" was not defined by statute, but that a reputable dictionary defined it as "'not knowing or perceiving . . . free from self–awareness.'"

---

[1]RCW 46.20.308(4) provides:

"Any person who is dead, unconscious, or who is otherwise in a condition rendering him or her incapable of refusal, shall be deemed not to have withdrawn the consent provided by subsection (1) of this section and the test or tests may be administered, subject to the provisions of RCW 46.61.506, and the person shall be deemed to have received the warnings required under subsection (2) of this section."

[2]Although Ms. Steffen does not contend.that the trooper should have required her to have a blood test, this would have been the outcome if the trooper had made a determination she was unconscious within the meaning of the statute.

[3]*Oaks* was interpreting the unconscious exception, then codified as RCW 46.20.308(2).

*Oaks,* at 896.[4] The court expanded this definition as follows:

> To be "unconscious" within the meaning of the statute, a motorist must manifest symptoms of such a lack of self-awareness or inability to perceive as to render him completely unable to exercise judgment. Physical incapacity, such as an inability to walk, talk or observe, is the strongest evidence. The present inability to recall the incident is weak evidence at best.

*Oaks,* at 896. We agree. A person is unconscious within the meaning of RCW 46.20.308(4) when he or she is without awareness, sensation, or cognition. *Random House Dictionary* 2058 (2d ed. 1987).

Here, the trial court found that Ms. Steffen was intermittently coherent and incoherent, mostly incoherent. She stated she did not know why she was at the jail and used words to the effect she did not want to submit to a breath test.[5] She needed assistance in order to walk and stand.[6]

---

[4]*Oaks* "balanced" this definition with the remaining two exceptions to the statute (death and other conditions rendering drivers incapable of refusal), then concluded "the statute contemplates excusing drivers from license revocation only when they are unable, for reasons *other than intoxication,* to exercise an intelligent judgment." (Italics ours.) However, as the trial court in the case at bar pointed out, *Oaks* then proceeded to determine whether the defendant was unconscious *because* of his intoxication.

[5]No error has been assigned to finding of fact 6: "At the jail, Ms. Steffen was intermittently coherent and incoherent, though she was mostly incoherent. She stated she did not know why she was at the jail. Trooper Nettleton requested Ms. Steffen to submit to the BAC Datamaster breath test. She stated orally that she would not take the test and using words to the effect that she did not want to submit to the test."

[6]Trooper Nettleton testified as to Ms. Steffen's physical condition when he first observed her along Interstate 90:
"A. She had to hang on to the car every time she took a step.
". . . .
"Q. Did you approach Mrs. Steffen?
"A. Yes, I did.
"Q. Can you describe her general appearance for us, beyond what you've already told us?
"A. Just the fact that she was just disoriented, and she needed a lot of support just to stand.
"Q. Support from what?
"A. The motor vehicle.

She had trouble speaking and did not communicate or respond well. Yet, when the officer came upon Ms. Steffen, she was attempting to maneuver her car out of some ruts. She had enough awareness to express concern about getting her children and about relieving herself in an area at least partially sheltered from the public.[7]

■■ If supported by substantial evidence, a trial court's findings will not be disturbed on appeal. *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973). Substantial evidence is evidence sufficient to persuade a fair–minded person of the truth of the matter. *Department of Licensing v. Sheeks,* 47 Wn. App. 65, 734 P.2d 24, *review denied,* 108 Wn.2d 1021 (1987). We hold there was substantial evidence to support the trial court's finding that Ms. Steffen was not "unconscious" within the meaning of RCW 46.20.308(4).

Ms. Steffen next contends the trial court erred in concluding that one who suffers confusion as a result of involuntary intoxication cannot give a valid refusal. She argues

---

"Q. How close did you get to her?
"A. Right up next to her, and I asked her what was wrong.
". . . .
"Q. Did she need assistance from you?
"A. She hung on to my shoulder and arm . . .".
After Trooper Nettleton took Ms. Steffen to the Grant County Jail, he testified her condition was as follows:
"A. . . . [W]hen I first started I had to call a matron out to assist me, because I would start to read—I mean she was physically and mentally upset. It was obvious. She kept hanging on, and so I called for a matron.
"Q. She was hanging on to you physically for support?
"A. Yes. When I finally got another matron to hang on to her, I read the defendant's warning, the common form on our Washington State Patrol document."

[7]Officer Nettleton testified:
"A. [She] kept saying, 'I've got to get my kids. Got to get my kids.' And the kids didn't want to go. They stayed as far away as they could.
"Q. What did you do then?
"A. I asked her how much she had had to drink, and she didn't make a statement. She didn't reply. At that point, for everyone's safety, I moved her away from the car and shut the car. I tried to get her up on the shoulder, and she said she still had to use the restroom. She went out behind her vehicle. I called another trooper to come help with the kids."

she was a person "otherwise in a condition rendering him or her incapable of refusal . . ." under RCW 46.20.308(4).

In *McElwain,* the defendant argued he was too intoxicated to comprehend and respond to an officer's request that he submit to a test. The evidence revealed the defendant was incoherent and made no intelligible response to the arresting officer's request. He was unable to sign a form presented to him to indicate refusal. The court found the defendant's contention was seriously at odds with the DWI statutory scheme.

> To [accept the defendant's contention would] exempt from the statutory coverage a class of persons whose driving is the most dangerous—those who, while not too intoxicated to drive, are nevertheless too intoxicated to respond intelligently to stimuli in their surroundings.
>
> The people of this state, in adopting this initiative, must have had in mind the fact that there are varying degrees of intoxication, and that the more intoxicated one becomes, the less he is capable of exercising an intelligent judgment. They nevertheless expressed an intent that any intoxicated person having sufficient control of his faculties to operate a motor vehicle should submit either to a test for blood alcohol or to the revocation of his license.

*McElwain,* at 627–28.

Although a driver must be advised of the consequences of a refusal to take a breath test, *McElwain* held the purpose of the requirement was to provide the driver "the opportunity of exercising an intelligent judgment *if he is capable of doing so.*" (Italics ours.) *McElwain,* at 628.

The facts in this case are similar to those in *Junkley v. Department of Motor Vehicles,* 7 Wn. App. 827, 503 P.2d 752 (1972). In *Junkley,* the defendant drank alcohol at a restaurant and then took an unidentified pill prescribed by his physician. Police found his automobile in the left lane of a city street. He was slumped over the wheel, the motor was running, the gearshift was in drive and his foot was on the brake. The defendant was aroused by the police and arrested for DWI. He refused to take a breath test. His sole defense was that the combined effect of the alcohol and

medication rendered him so intoxicated he was in a condition rendering him incapable of refusal.

*Junkley* noted that *McElwain* had already decided that a defendant too intoxicated to understand the implied consent warnings could not escape the consequences of refusal. The only issue was whether there was a different result if the intoxicated state was caused by a combination of drugs and alcohol. *Junkley* held it did not matter whether the intoxicated state was caused by drugs, alcohol, or a combination of both. A driver's degree of intoxication was not a proper consideration in determining if the arresting officers afforded the driver *the opportunity* to exercise an intelligent judgment. We agree.

In *Gibson v. Department of Licensing,* 54 Wn. App. 188, 773 P.2d 110, *review denied,* 113 Wn.2d 1020 (1989), the defendant argued that his psychosis (manic depression) was a condition rendering him incapable of refusing a breath test. In construing the phrase "'or who is otherwise in a condition rendering him incapable of refusal,'" *Gibson,* at 192, applied the ejusdem generis rule as set forth in *Dean v. McFarland,* 81 Wn.2d 215, 221, 500 P.2d 1244, 74 A.L.R.3d 378 (1972):

> The *ejusdem generis* rule requires that general terms appearing in a statute in connection with specific terms are to be given meaning and effect only to the extent that the general terms suggest items similar to those designated by the specific terms. In short, specific terms modify or restrict the application of general terms where both are used in sequence.

*Gibson,* at 192.

As explained in *Gibson,* at 192, the specific terms in the statute, "death" and "unconsciousness", are physical states "readily discernible to an observer such as a police officer." Consequently, the general phrase "or who is otherwise in a condition rendering him incapable of refusal" should be restricted to *physical* conditions preventing a driver from responding to an officer's request. *Gibson,* at 193. The court gave as an example a driver who sustained such severe

mouth and facial injuries he could not speak or was in such pain that communication was highly unlikely.

█ The statutory phrase "a condition rendering him or her incapable of refusal" should be construed so an arresting officer has a reasonable basis for ascertaining whether the condition exists. We agree with *Gibson* that the phrase should be narrowly construed and limited to physical conditions preventing a driver from responding to an officer in any meaningful way. Further, it is of no significance whether the conditions were induced by the driver's voluntary or involuntary acts, since even the most astute observer could not be expected to make such determination.

We hold the findings of the trial court support the conclusion that Ms. Steffen was capable of refusing a breath test and did refuse the test. We therefore affirm the revocation of her license.

SHIELDS, A.C.J., and MUNSON, J., concur.