944 P.2d 1014 (1997)
133 Wash.2d 290
Thomas R. MEDCALF, Petitioner,
v.
STATE of Washington, DEPARTMENT OF LICENSING, Respondent.
No. 64509-4.
Supreme Court of Washington, En Banc.
October 2, 1997.
*1015 Prince, Kelley, Marshall & Coombs, David S. Marshall, Seattle, for petitioner.
Christine O. Gregoire, Atty. Gen., James Schmid, Asst. Atty. Gen., Seattle, for respondent.
GUY, Justice.
The issue in this case is whether a driver who refuses to take a breath alcohol test as required by the implied consent law, RCW 46.20.308, may challenge the subsequent revocation of his license on the ground that he suffers from a mental disorder which prevented him from refusing or from taking the test.
We hold that the existence of a mental disorder which is not manifested by objective, physical symptoms, so as to permit the arresting officer to administer a blood test, is not a defense for refusing to submit to a breath test and is not relevant to the issues to be resolved in a license revocation proceeding under the implied consent law.

FACTS
Shortly after 2:30 a.m. on June 22, 1991, Petitioner Medcalf was arrested by a Bainbridge Island police officer for suspicion of driving while under the influence of alcohol. The arresting officer, Denise Giuntoli, testified that she had reasonable grounds to believe Medcalf was driving while under the *1016 influence (DWI), and Medcalf stipulated to this fact.
Medcalf was taken to the Bainbridge Island police station. He immediately asked to speak with a lawyer. Officer Giuntoli provided access to the telephone and directory assistance, but Medcalf apparently was unable to contact his attorney. He then asked for a public defender, and Officer Giuntoli telephoned the Bainbridge Island public defender for him. Medcalf spoke with that public defender and asked the attorney to meet with him at the police station. The attorney refused and said that he would advise Medcalf only over the telephone. Medcalf then told police he wanted a different attorney. He was given a telephone directory, opened to the attorney section in the yellow pages, and was told he could call whomever he wanted and that he could make as many telephone calls as he wanted. Medcalf did not call another attorney but continued to request a public defender who would meet with him at the police station.
Medcalf then was read his Miranda[1] rights and signed a statement acknowledging that he understood them. He said he wanted to remain silent and told officers that he wished to invoke his Fifth Amendment rights.
Medcalf then was read his rights under the implied consent law. One of the rights read to him was that he had the right to refuse to take a breath test, but that if he did refuse, his license would be revoked. After she read him the statement, Officer Giuntoli explained the rights to him. Medcalf responded that he would not lose his license. A second officer also explained that a consequence of refusing to take the breath test would be revocation of his driver's license. Medcalf reportedly replied, "no it won't" and "I want my lawyer here." Report of Proceedings at 119.
It is undisputed that Medcalf understood the consequences of his refusal because he had previously had his license revoked for refusing to take the breath alcohol test.
Although he was asked more than once to take the test, Medcalf would not take the breath test.
Medcalf also refused to sign the DWI citation. Officer Giuntoli told Medcalf that if he did not sign the citation, she would have to book him into the Kitsap County jail. He reportedly responded that he was not going to sign anything until the officers brought a lawyer to the police station so that he could talk to a lawyer personally.
Medcalf's explanation of the events of that night is that after he finished work in Bellevue on the evening of June 21, 1991, he did drink some beer, but not enough to affect his ability to drive. About 2 a.m., he caught the ferry to Bainbridge Island. Shortly after driving off the ferry he was stopped by Officer Giuntoli.
Medcalf claims that when he was stopped by Officer Giuntoli he began having an obsessive-compulsive disorder attack. He states he wanted to take the breath test to prove he was not intoxicated, but his obsessive-compulsive disorder made him incapable of complying with the officer's requests that he submit to the test.
Obsessive-compulsive disorder is a mental or psychiatric disorder. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 417-18 (4th ed.1994) (hereafter DSM-IV). The DSM-IV describes obsessive-compulsive disorder as follows:
The essential features of Obsessive-Compulsive Disorder are recurrent obsessions or compulsions ... that are severe enough to be time consuming ... or cause marked distress or significant impairment....

Obsessions are persistent ideas, thoughts, impulses, or images that are experienced as intrusive and inappropriate and that cause marked anxiety or distress....
The most common obsessions are repeated thoughts about contamination ... repeated doubts ... a need to have things in a particular order ... aggressive or horrific impulses ... and sexual imagery....

*1017 The individual with obsessions usually attempts to ignore or suppress such thoughts or impulses or to neutralize them with some other thought or action (i.e., a compulsion). For example, an individual plagued by doubts about having turned off the stove attempts to neutralize them by repeatedly checking to ensure that it is off.

Compulsions are repetitive behaviors (e.g., hand washing, ordering, checking) or mental acts (e.g., praying, counting, repeating words silently) the goal of which is to prevent or reduce anxiety or distress, not to provide pleasure or gratification. In most cases, the person feels driven to perform the compulsion to reduce the distress that accompanies an obsession or to prevent some dreaded event or situation.
DSM-IV, at 417-18. See also Report of Proceedings at 7-12.
Medcalf began showing symptoms of obsessive-compulsive disorder in the early 1980s. At the time of his arrest in 1991, his disorder was substantially controlled by medication. His psychologist, who had begun treating him in 1985, was not providing regular treatment by the time of trial and testified that he might see Medcalf once or twice a year. The psychologist testified, in an offer of proof, that Medcalf's obsessions largely revolved around images of violence, crimes and other stimuli associated with the judicial system. The psychologist testified that in order to avoid something bad from happening, Medcalf would have to correct his thoughts of violence or crime by countering them with thoughts that "felt right." An obsessive-compulsive attack in Medcalf could be triggered by anything to do with the judicial system or law enforcement, including being stopped for DWI. The psychologist testified, in an offer of proof, that "there's a good likelihood that [Medcalf's] obsessional disorder rendered him unable to comply with the request to take the breath test." Report of Proceedings at 27.
At the time the officers were attempting to administer the breath test, Medcalf maintains he "began going off into a little world of [his] own." Report of Proceedings at 53. He testified that his thoughts were of "Gary Gilmore, his execution, what he did to other people." Report of Proceedings at 54. Because he was trying to counter these thoughts, Medcalf contends he could not respond to the officers' requests to take the breath test.
Medcalf was ultimately found guilty of negligent driving but acquitted of DWI. Because he refused to take the breath test, his license was revoked by the Department of Licensing for two years, pursuant to former RCW 46.20.311(2)(e). See also RCW 46.20.3101(1)(b) (current law governing license revocation sanctions under the implied consent law).[2] Medcalf requested a formal hearing on the revocation, and the revocation was affirmed. He then appealed de novo to the superior court, under former RCW 46.20.308(8) and RCW 46.20.334,[3] claiming that he did not "refuse" to take the breath test because his obsessive-compulsive disorder made him unable to refuse or unable to take the test. In an order on a motion in limine, the trial court ruled that a mental disorder is not a defense to noncompliance under the implied consent statute and prohibited Medcalf from introducing evidence of his mental disorder. The jury rendered a verdict in favor of the Department of Licensing, and Medcalf appealed.
The Court of Appeals affirmed, Medcalf v. Department of Licensing, 83 Wash.App. 8, 920 P.2d 228 (1996), review granted, 131 Wash.2d 1005, 932 P.2d 645 (1997), and Medcalf petitioned this court for review. We accepted review and now affirm the Court of Appeals.

ISSUE
Is a driver who challenges his license revocation under the implied consent law entitled *1018 to present evidence showing that a mental disorder rendered him incapable of refusing or taking the breath alcohol test?

ANALYSIS
The issue in this appeal is one of statutory interpretation. An issue of statutory interpretation is a question of law and is reviewed de novo. Clauson v. Department of Labor & Indus., 130 Wash.2d 580, 583, 925 P.2d 624 (1996); Wheeler v. Department of Licensing, 86 Wash.App. 83, 85, 936 P.2d 17 (1997).
The implied consent law was passed by an initiative of the people of this state in 1968 and codified at RCW 46.20.308. Initiative Measure 242; Laws of 1969, ch. 1, § 1.
The purposes of the law are: (1) to discourage individuals from driving motor vehicles while under the influence of alcohol or drugs; (2) to remove the driving privileges of those individuals who are disposed to driving while intoxicated; and (3) to provide an efficient means of gathering reliable evidence of intoxication or nonintoxication. See Nowell v. Department of Motor Vehicles, 83 Wash.2d 121, 124, 516 P.2d 205 (1973); Department of Licensing v. Lax, 125 Wash.2d 818, 821, 888 P.2d 1190 (1995); Steffen v. Department of Licensing, 61 Wash.App. 839, 847, 812 P.2d 516 (1991).
The law essentially provides that a person who drives in this state is deemed to have consented to a test to determine the alcohol content of his or her blood or breath, if arrested for suspicion of DWI. RCW 46.20.308(1). If the driver refuses to submit to the test, his or her driver's license will be revoked by the Department of Licensing. Former RCW 46.20.308(6); RCW 46.20.308(7). See also Lax, 125 Wash.2d at 821, 888 P.2d 1190.
As we stated in Department of Motor Vehicles v. McElwain, 80 Wash.2d 624, 627, 496 P.2d 963 (1972), the clear intent of the statute is that the test will be administered, by breath or blood, in every case where the officer has reasonable grounds to believe that the driver is under the influence of intoxicating liquor, except where the test is refused. A driver who refuses loses his or her license to drive.
The word "refuse" is not defined in the statute and it is, therefore, given its ordinary meaning. Lax, 125 Wash.2d at 822, 888 P.2d 1190. In Lax we held that "refuse," under the implied consent law, means to express a positive unwillingness to comply with the officer's request for a breath or blood sample. Lax, 125 Wash.2d at 822, 888 P.2d 1190. See also Woolman v. Department of Motor Vehicles, 15 Wash.App. 115, 117, 547 P.2d 293 (1976); Wolf v. Department of Motor Vehicles, 27 Wash.App. 214, 217, 616 P.2d 688 (1980). In McElwain, we stated that if a driver does not willingly submit to and cooperate in the administration of a breath or blood test, he or she will be deemed to have refused the test. McElwain, 80 Wash.2d at 628, 496 P.2d 963.
RCW 46.20.308(4) provides an exception to the law in those instances where the driver is not capable of refusing the test. In such cases the driver will not be deemed to have refused the test, but a blood test may be given in lieu of the breath test. RCW 46.20.308(4). See Gibson v. Department of Licensing, 54 Wash.App. 188, 192-93, 773 P.2d 110, review denied, 113 Wash.2d 1020, 781 P.2d 1322 (1989).
RCW 46.20.308(4) provides:
Any person who is dead, unconscious, or who is otherwise in a condition rendering him or her incapable of refusal, shall be deemed not to have withdrawn the consent provided by subsection (1) of this section and the test or tests may be administered... and the person shall be deemed to have received the warnings required under subsection (2) of this section.
The statutory phrase, "a condition rendering him or her incapable of refusal," contained in RCW 46.20.308(4) has been limited to physically manifested conditions which prevent a driver from responding to or complying with an officer's request for a blood or breath sample. Steffen, 61 Wash.App. at 846, 812 P.2d 516; Gibson, 54 Wash.App. at 192-93, 773 P.2d 110; Nettles v. Department of Licensing, 73 Wash.App. 730, 733, 870 P.2d 1002 (1994). This interpretation of the law provides an arresting officer with a reasonable *1019 basis for ascertaining whether the condition asserted exists so that a blood test might be given, Steffen, 61 Wash.App. at 847, 812 P.2d 516, and does not require the officer to guess at what, in fact, the driver's mental state might be. See Nettles, 73 Wash.App. at 733, 870 P.2d 1002.
This court and the Court of Appeals have declined to extend the statutory language of RCW 46.20.308(4) ("rendering him or her incapable of refusal") to include those cases where the driver is not capable of refusing to take the test because of a mental condition which is not objectively and physically manifested. We have held that the implied consent law does not require the driver to make a knowing and intelligent decision to refuse the test. It requires only that the driver have an opportunity to exercise informed judgment. McElwain, 80 Wash.2d at 628, 496 P.2d 963. Thus, in McElwain, a license revocation proceeding, we held that a driver who was so intoxicated that he was not able to refuse the test was not "incapable of refusal" within the meaning of RCW 46.20.308(4). In Gibson, the Court of Appeals held that a driver's manic depressive mental disorder, which allegedly prevented him from making an intelligent decision with respect to taking the test, did not render the driver incapable of refusal. The driver in Steffen, who was intermittently coherent and incoherent due to ingestion of drugs and alcohol, was not rendered incapable of refusing the test under the terms of RCW 46.20.308(4).
Medcalf acknowledges this prior case law and admits that, under RCW 46.20.308(4), a police officer is entitled to rely on physical manifestations of injury or incapacity to determine whether a driver is incapable of refusing to take the breath test so that a blood test might be given. Medcalf does not disagree with this interpretation of the statutebut only insofar as it is limited to a police officer's assessment of the driver's conduct under subsection (4) of RCW 46.20.308.
It is not subsection (4) but, rather, former subsection (7) which Medcalf asks us to construe in this case.
Medcalf argues that the statutory scheme of the implied consent law provides for two distinct and independent assessments of whether a driver has refused to submit to a breath test. Under Medcalf's interpretation of the law, the first assessment is made by the arresting officer, under RCW 46.20.308(4) and (5); the second is made at a hearing challenging the license revocation, under former RCW 46.20.308(7) (administrative hearing) and former RCW 46.20.308(8) (judicial review).[4]
Former subsection (7) provides that the scope of a hearing on the revocation shall cover the issues of:
[1] whether a law enforcement officer had reasonable grounds to believe the person had been driving or was in actual physical control of a motor vehicle within this state while under the influence of intoxicating liquor, [2] whether the person was placed under arrest, and [3] whether the person refused to submit to the test or tests upon request of the officer after having been informed that such refusal would result in the revocation of the person's privilege to drive.
Former RCW 46.20.308(7) (part) (emphasis added). See also RCW 46.20.308(8); Nowell, 83 Wash.2d at 123, 516 P.2d 205 (holding the issues to be decided by the superior court on review are the same as the issues before the Department).
Medcalf argues that the word "refuse," as used in former subsection (7), has a different meaning from the word "refuse" which is contained in subsection (4) of RCW 46.20.308.
When the same word or words are used in different parts of the same statute, it is presumed that the words of the enactment are intended to have the same meaning. Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 313, 884 P.2d 920 (1994) (citing State v. Hutsell, 120 Wash.2d 913, 920, 845 P.2d 1325 (1993) and *1020 Cowles Publ'g Co. v. State Patrol, 109 Wash.2d 712, 722, 748 P.2d 597 (1988)).
As noted above, the meaning of "refuse" in the context of the implied consent law, subsections (1) through (5), was first determined by this court in 1972. McElwain, 80 Wash.2d at 628, 496 P.2d 963. Under McElwain, if a driver "does not willingly submit and cooperate in the administration of a test, he must be deemed to have refused." Id. See also Lax, 125 Wash.2d at 822, 888 P.2d 1190.
Medcalf proposes that the trier of fact in a revocation hearing should consider whether a driver is subjectively willing, but psychologically unable, to submit to the breath test. However, the implied consent law determines the scope of the issues to be decided at the revocation hearing. The pertinent issue here is whether the driver refused to submit to the test upon request. We are bound to construe the word "refuse" as having the same meaning in each subsection of the same statutory section. Timberline, 125 Wash.2d at 313, 884 P.2d 920. Therefore, the test we apply is not whether the driver was subjectively willing to take the test, but whether the driver's objective conduct showed a willingness to submit to the administration of the test, or whether the driver was unable, based on objective evidence, to take the test.
Because he did not show or express any willingness to take the test, Medcalf's conduct constituted a "refusal" to submit to the breath test under our prior case law.
Medcalf offers no clear basis for distinguishing his situation from that of the driver in Gibson (manic depressive disorder did not render driver incapable of refusing test) or McElwain (alcohol intoxication did not render driver incapable of refusing test).[5] Further, his situation is not similar to that of the drivers involved in Woolman and Wolf, where the drivers made an attempt to take the breath test. The Court of Appeals held in Woolman and Wolf that whether a driver's failure to blow a sufficient amount of air into the breath alcohol machine constitutes a refusal to take the test is a question of fact. Woolman, 15 Wash.App. at 117-18, 547 P.2d 293; Wolf, 27 Wash.App. at 217, 616 P.2d 688. The test applied in both Woolman and Wolf for determining refusal was whether the conduct of the drivers demonstrated an unwillingness to cooperate in the administration of the test. This is an objective, not a subjective, test.
The purposes of the statute, particularly the goal of gathering reliable evidence, will not be furthered by permitting a driver to show, at a later hearing, that he subjectively wanted to take the breath test but, because of a mental disorder, was unable to do so. In such cases the opportunity for a blood test to gain reliable evidence of intoxication or nonintoxication is lost.

CONCLUSION
The intent of the statute is to ensure that all drivers in this state will be subject to a breath or blood test upon arrest for suspicion of DWI or, upon refusal of the test, will lose their licenses to drive. McElwain, 80 Wash.2d at 627, 496 P.2d 963.
To exempt drivers who suffer from mental disorders from the impact of the statute is contrary to the intent of the law and would work against the statute's goals of promoting public safety, deterrence, and evidence reliability.
Affirmed.
DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON and TALMADGE, JJ., concur.
MADSEN, Justice, concurring.
Neither the implied consent statute nor its policy underpinnings require the majority's conclusion that in a driver's license revocation proceeding based upon "refusal" to submit to a breath test for alcohol, a mental condition rendering the driver unable either to refuse or to cooperate in the test is an irrelevant consideration. The majority's result *1021 is particularly unfortunate because it fails to acknowledge that a mental disorder may be just as debilitating as a physically manifested condition incapacitating the driver. I concur in the result reached by the majority, however, because the driver's offer of proof was insufficient to show that his mental disorder prevented him from responding when informed of his choice to take a breath test or refuse and have his license revoked.
Fundamental to the majority's reasoning is the principle that the implied consent statute requires that a driver either willingly cooperate in a breath alcohol test or suffer revocation of his or her driver's license, the only exception being where a law enforcement officer can determine objectively that a physically manifested condition has incapacitated the driver and he or she is unable either to submit to the test or refuse to do so. There is support for the majority's approach in Department of Motor Vehicles v. McElwain, 80 Wash.2d 624, 627, 496 P.2d 963 (1972), where the court said that the implied consent statute requires drivers to either submit to a test for blood alcohol content or be subject to license revocation.
However, another principle embodied in the implied consent statute is that the requirement that drivers be advised of the choice to submit to a test or refuse and have their licenses revoked has the "obvious purpose... to provide [the driver] the opportunity of exercising an intelligent judgment if he is capable of doing so." Id. at 628, 496 P.2d 963. A driver suffering a mental disorder such as Mr. Medcalf alleges may, when suffering an obsessive-compulsive disorder attack, be denied the opportunity to make such an intelligent judgment, not because the officer does not give the required advisement, nor because of anything the driver has done or refrained from doing volitionally, but rather because of the mental disorder. In other words, drivers would be just as incapable of making and acting on that intelligent judgment as if they were unconscious. Under such circumstances, there is no meaningful opportunity to make the choice.
A mental disorder which prevents the driver from making any choice at all regardless of the fact the individual may want to cooperate a disorder which cannot be objectively discerned by the officercreates obvious tension between the two principles. On the one hand, the apparent failure to cooperate may be deemed a refusal requiring license revocation. On the other hand, the drivers have neither cooperated nor refused to do so because they were unable to make or act on an intelligent judgment when the officer advised them of their choice. The problem, of course, is that while license revocation is intended to be a consequence of refusing to submit to a test, it instead becomes a penalty for suffering from a mental disorder beyond the driver's control.
Contrary to the Department of Licensing's position that consideration of a mental disorder would make it impossible for the officer in the field to determine when a refusal to submit to a test occurs, Mr. Medcalf agrees with the judicial interpretations of those portions of the implied consent statute which direct when the officer in the field may deem failure to cooperate as a refusal to take the test. As the majority observes, case law holds that under RCW 46.20.308 if a driver does not willingly submit to and cooperate in the administration of a breath or blood test, that driver will be deemed to have refused the test unless dead, unconscious, or in a physically manifested condition rendering the driver incapable of refusal. Majority at 1019 (emphasis added); see RCW 46.20.308(4). This interpretation allows an arresting officer to reasonably determine pursuant to objective criteria whether the person was in a condition rendering him or her incapable of refusal. If a driver is in such a condition, then by the express terms of the statute the person is deemed not to have withdrawn consent to a breath or blood test and to have received the required warnings, thus permitting a blood test to be administered. RCW 46.20.308(4). The officer in the field cannot be expected to determine whether the driver suffers a mental disorder rendering him or her incapable of refusal without objective factors exhibiting incapacity.
However, Medcalf contends that where former RCW 46.20.308(7) and (8) (now subsections *1022 (8) and (9)) are concerned, the focus is on the duties of the Department and the courts, and for purposes of whether a license should be revoked, the Department and the courts should consider whether in fact he refused to submit to a breath or blood test. If he did not, because he was suffering an obsessive-compulsive disorder attack, his license should not be revoked.
The majority rejects this argument. The majority relies upon the presumption that where the same word is used in different parts of an enactment, it is presumed the same meaning is intended throughout. Accordingly, the majority interprets "refuse" the same way throughout the statute. However, the presumption should give way when the context of the statute indicates a different meaning is appropriate. This court has recognized, for example, a nearly identical presumption that the same meaning is intended when the Legislature has used a word with a particular meaning in a statute and then subsequently uses the same word in legislation on the same subject. However, the presumption is only that, i.e., a presumption:
"Whenever a legislature had used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to indicate that it intended a different meaning thereby."
Garrison v. Washington State Nursing Bd., 87 Wash.2d 195, 197, 550 P.2d 7 (1976) (emphasis added) (quoting State ex rel. American Piano Co. v. Superior Court, 105 Wash. 676, 679, 178 P. 827 (1919) (quoting in turn 36 Cyc. Law & Proc. 1150 (1910))) see also Champion v. Shoreline Sch. Dist. 412, 81 Wash.2d 672, 676, 504 P.2d 304 (1972); East v. King County, 22 Wash.App. 247, 254, 589 P.2d 805 (1978). The same reasoning holds true where the same word is used in different subsections of a statute.
Here, the structure of the statute indicates that the first subsections deal with the officer's actions in the field, but the latter sections deal instead with the role of the Department and the courts. This distinction indicates a different approach to "refuse" in the different subsections may be appropriate. Further, while objective physical manifestations may be needed for the law enforcement officer to carry out the purposes of the statute, the same is not true of the Department and the courts. Whether in an administrative or court proceeding, taking and evaluating evidence are routine, and both the Department and the courts are well equipped to assess evidence that no refusal in fact occurred, including evidence of a mental disorder alleged to have prevented the driver from submitting to a test, even though such a determination would be beyond the ability of the officer in the field.
In addition, given the purpose of the statute to provide for revocation as a consequence of refusing to submit to and cooperate in a breath or blood test, revocation should not be a consequence where a mental disorder makes it impossible to submit to a test. Significantly, refusal is "deemed" where there is no positive willingness to take and cooperate in the test. Plainly, deeming inaction to be a refusal is not to say that the driver has in fact actually refused. While expediency necessitates the interpretation accorded the term "refuse" in the first subsections of RCW 46.20.308, and the "deeming" of a refusal due to lack of submission to and cooperation in a test, thus permitting the officer to enforce the statute, no similar expediency is needed when the Department and the courts later assess whether a mental disorder prevented the driver from exercising and acting on any intelligent judgment. Given the lack of need for such expediency at the revocation proceedings and the obvious intention that revocation is a consequence of failing to cooperate, the term "refuse" should not be given the same meaning in former subsections (7) and (8) as in subsection (4).
The nature and the context of the implied consent statute overcome the presumption that the same interpretation should be accorded the term "refuse" in all its subsections.
Next, the majority concludes that appellate decisions disfavor Mr. Medcalf's position. For example, in McElwain, this court rejected *1023 the argument that severe intoxication could be offered as a reason why a driver was "incapable of refusal." It is important to remember, however, that the nature of the asserted mental condition, severe intoxication while driving, involves the very evil the statute is designed to sanction and deter. As the court noted, accepting defendant's argument would "exempt from the statutory coverage a class of persons whose driving is the most dangerousthose who, while not too intoxicated to drive, are nevertheless too intoxicated to respond intelligently to stimuli in their surroundings." McElwain, 80 Wash.2d at 627, 496 P.2d 963. The same is true in Steffen v. Department of Licensing, 61 Wash. App. 839, 812 P.2d 516 (1991) (where the driver ingested both drugs and alcohol).
In my view, the few other Court of Appeals decisions relied upon by the majority and the Department in its briefing fail to appreciate the distinction between a determination of refusal for purposes of the officer's actions in the field, necessarily driven by expediency, and the later judicial determination that a refusal in fact occurred.
The majority says, though, that the policies underlying the implied consent statute would not be satisfied if Mr. Medcalf was entitled to present evidence that he wanted to take the test but was unable to do so because of his mental disorder. Those policies are to discourage people from driving while under the influence of alcohol or drugs, to remove the driving privileges of those who are inclined to drive while intoxicated, and to provide an efficient means of gathering evidence of intoxication or nonintoxication through breath or blood alcohol tests. Majority at 1018 (citing cases). The majority reasons that the evidence-gathering goal in particular would not be furthered. Majority at 1020.
As to the first of these policies, discouraging driving while intoxicated, the Department claims that those with mental disorders would drive drunk with impunity if they could later claim they did not refuse a test due to their mental disorder. There are several reasons why this contention is unpersuasive. First, it is completely speculative. Second, although the results of a breath or blood test are valuable evidence in a prosecution for driving while intoxicated, other evidence of impairment is often available to support a conviction. Simply the fact that someone suffers from a mental disorder is no assurance that a drunk driving conviction can be avoided, and the deterrent effect of a possible conviction cannot be discounted. Third, the time and expense involved in presenting evidence of a mental disorder would tend to discourage any "plotting" on the part of a person suffering from a mental disorder to drive while intoxicated with the intention of claiming that no refusal to take a breath or blood alcohol test occurred because of a mental disorder attack. Finally, the trier of fact must be convinced that the driver was unable to submit to a test although wanting to do so.
The second policy is the removal of the driving privileges of those inclined to drive while intoxicated. This policy, too, would not be undermined by allowing presentation of evidence that because of a mental disorder a driver did not in fact refuse a breath test and would have submitted to a test if able to do so. By way of comparison, a driver who submits to a test obviously is not seeking to avoid the test. The same thing is true of the driver who would have submitted to a test but for a mental disorder attack. The policy of removing the driving privileges of those inclined to drive while intoxicated is not implicated any more in the case of the driver who cannot submit to a test because of a mental disorder than it is for the driver who in fact submits to a test. The only significant difference is that in the latter case there will be additional evidence of intoxication or nonintoxication. Perhaps this is why the only policy the majority specifically refers to is the evidentiary policy.
Turning to the policy of efficient gathering of evidence, I agree that in a case like this one the evidence of breath or blood alcohol content will not be attainable by the law enforcement officer. To that extent, the circumstances are like those where a driver affirmatively refuses to submit to a breath or blood alcohol test, for in neither case will test results be available.
However, the big difference is that one who affirmatively refuses to submit to a test *1024 or fails to willingly cooperate although able to do so "deserves what he gets," so to speak, by the terms of the statute, i.e., license revocation. In contrast, under the facts Mr. Medcalf alleges, the driver is penalized for having a mental disorder rather than for refusing to submit to a test. Thus, as a policy matter, the majority's reading of RCW 46.20.308 is fundamentally unfair to those who suffer from a mental disorder rather than a physical injury or condition making it impossible for them to submit to a breath or blood test. This is a particularly unfortunate result in a time when as a society we understand that a mental disorder may be as completely debilitating as a physical condition. It is also unfortunate where the statute does not demand the result.
I would hold that evidence that a driver was suffering from an obsessive-compulsive disorder attack which prevented the driver from submitting to and cooperating in a breath or blood test should be admissible in a driver's license revocation proceeding in order to determine whether the driver "refused to submit to the test or tests upon the request of the officer...." Former RCW 46.20.308(7) (now subsection (8)) (concerning Department hearing); see former RCW 46.20.308(8) (now subsection (9)) (concerning court proceedings).
In this case, however, Mr. Medcalf's offer of proof[1] was insufficient to show that he was unable to submit to a test when requested to submit to a breath test. Mr. Medcalf sought to introduce expert psychological testimony about his disorder, reinforced by psychological opinion testimony as to whether he was suffering an obsessive-compulsive disorder attack which prevented him from submitting to the breath test. When Medcalf made his offer of proof, his psychologist testified that he felt "certain" that Medcalf had experienced an obsessive-compulsive episode when arrested, taken to the police station, and requested to submit to a test. Verbatim Report of Proceedings (RP) at 34, 35, 37. However, when asked to give his opinion as to whether Medcalf refused or could have refused the breath test, he testified that "there's a good likelihood that [Medcalf's] obsessional disorder rendered him unable to comply with the request to take the Breathalyzer test." Id. at 27. He also testified, when asked if an obsessive-compulsive attack had anything to do with Medcalf's response to a request to take the breath test, "I believe it certainly could." Id. at 24.
Expert opinion testimony about a person's mental status is not admissible unless the opinion is held with a reasonable degree of medical and psychological certainty. See In re Twining, 77 Wash.App. 882, 891, 894 P.2d 1331 (1995). The issue of the degree of certainty required often arises where causation is at issue. For example, medical opinion testimony that an accident caused a physical condition "must rise to the degree of proof that the resulting condition was probably caused by the accident, or that the resulting condition more likely than not resulted from the accident, to establish a causal relation." Miller v. Staton, 58 Wash.2d 879, 886, 365 P.2d 333 (1961); see Ugolini v. States Marine Lines, 71 Wash.2d 404, 407, 429 P.2d 213 (1967). Testimony that an "accident or injury `might have,' `could have,' or `possibly did' cause the subsequent condition" is insufficient. Id. at 407, 429 P.2d 213. The evidence is insufficient if, considering all the medical testimony, the jury must resort to speculation or conjecture in determining the causal relationship. McLaughlin v. Cooke, 112 Wash.2d 829, 837, 774 P.2d 1171 (1989) (citing O'Donoghue v. Riggs, 73 Wash.2d 814, 824, 440 P.2d 823 (1968)).
Here, the psychologist's testimony that Medcalf suffered from obsessive-compulsive disorder, and that he suffered an attack when he was arrested and requested to submit to a breath test meets the "reasonable degree of medical certainty" standard. However, the psychologist's opinion testimony concerning the relationship between the disorder attack and Medcalf's response to the *1025 officer's request that he take a breath test was that there was a "good likelihood" the attack rendered Medcalf unable to comply with the request, and that he "believed" that the attack "certainly could" have had something to do with Medcalf's lack of response when requested to take a breath test. This testimony does not rise to the level of a reasonable degree of medical and psychological certaintyit is testimony in terms of possibility, not probability. Accordingly, the proffered testimony would have been inadmissible. For this reason, I concur in the result reached by the majority.
ALEXANDER, J., concurs.
SANDERS, Justice, dissenting.
I dissent for the reasons expressed in Justice Madsen's concurring opinion, differing only with her conclusion that Medcalf's offer of proof was insufficient to show that he was unable to submit to a test when requested to do so.
The deciding consideration for Justice Madsen was whether the psychological testimony contained in Medcalf's offer of proof is sufficient to meet the probability or "more likely than not" standard required to establish a causal relationship. Indeed Medcalf's psychologist testified that "`there's a good likelihood that [Medcalf's] obsessional disorder rendered him unable to comply with the request to take the Breathalyzer test.'" Concurrence at 1024 (citing Verbatim Report of Proceedings at 27) (emphasis added). Since "good likelihood" on its face means more probable than not, I would conclude Justice Madsen's concern is satisfied.[1] Therefore I would reverse and remand with instructions to the hearing examiner that the admissibility of this evidence be reconsidered in light of this opinion.
Additionally on remand I would grant the trial court leave to conduct such further proceedings as may be necessary to determine whether the psychological testimony at issue is sufficiently scientifically based to permit its admission under the standard set forth in Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.Cir.1923), superseded by statute as stated in Chikovsky v. Ortho Pharm. Corp., 832 F.Supp. 341 (S.D.Fla.1993).
As a general proposition expert testimony on a subject, to be admissible, must be based upon valid and reliable scientific principles. In Frye the United States Court of Appeals stated,
[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
Frye, 293 F. at 1014.
Scholars question whether much of the psychological/psychiatric testimony offered, or even received, into evidence could survive scrutiny under the Frye test. See, e.g., 1 Jay Ziskin and David Faust, Challenging the Scientific Status of Psychology and Psychiatry, in Coping with Psychiatric and Psychological Testimony 109 (4th ed. 1988) ("We will show that, within the areas of psychology and psychiatry most pertinent to the typical domains in which the expert witness operates, scientific status is seriously deficient.").
Arguments that our state ER 702 should be construed identically to federal rule of evidence 702 were rejected in State v. Copeland, 130 Wash.2d 244, 259, 922 P.2d 1304 (1996). It is therefore the rule in this jurisdiction *1026 that Frye rather than Daubert[2] controls such evidentiary questions; however, I do not believe the nuances which distinguish the two cases are particularly relevant here since our court held in Copeland:
The trial court's gatekeeper role under Frye involves by design a conservative approach, requiring careful assessment of the general acceptance of the theory and methodology of novel science, thus helping to ensure, among other things, that "pseudoscience" is kept out of the courtroom.
Copeland, 130 Wash.2d at 259, 922 P.2d 1304. Testing the admissibility of psychological and psychiatric evidence under ER 702 would be appropriate on remand.
I note, however, in the original hearing of this matter no threshold objection was raised pursuant to Frye, but rather the subject testimony was held inadmissible on grounds of relevancy. I would reverse on that basis because "refusal," as that term is appropriately understood in the concurring opinion, is ultimately what this case is all about, and certainly includes consideration of one's capacity to volitionally do just that. For these reasons I dissent and would remand to the hearing officer to conduct further proceedings consistent with this opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).
[2] The implied consent statute has been amended twice since Medcalf was arrested for DWI. Laws of 1994, ch. 275, and Laws of 1995, ch. 332. Neither amendment is pertinent to the facts or issues of this case. However, some of the subsections of the statute have been renumbered. Changes in the law are noted herein, where relevant.
[3] The statute no longer provides for de novo review. RCW 46.20.308(9).
[4] Subsections (7) and (8) have been renumbered as subsections (8) and (9). The pertinent language of the law has not changed.
[5] Manic depressive disorder is now called bipolar disorder. See DSM-IV, at 317-20, 328-30, 350-51. Bipolar disorder, alcohol intoxication, alcohol abuse, and alcohol dependence are all listed as mental disorders in DSM-IV, at 195-96, 317-20.
[1] Medcalf requested a formal hearing on his license revocation, and the revocation was affirmed. He then appealed de novo to superior court under former RCW 46.20.308(8) and RCW 46.20.334. In an order on a motion in limine, the trial court ruled that evidence of a mental disorder is not admissible to establish a defense to a failure to submit to and cooperate in a test. Medcalf then made his offer of proof.
[1] "Likely" is defined as probable. "`Likely' is a word of general usage and common understanding. It is broadly defined as `of such a nature or so circumstantial as to make something probable... having a better chance of existing or occurring than not.'" People v. Randall, 711 P.2d 689, 692 (Colo.1985) (quoting definition from Webster's Third New Int'l Dictionary 1310 (1976)). "Probability" is defined as "Likelihood; appearance of reality or truth; reasonable ground of presumption; verisimilitude; consonance to reason. The likelihood of a proposition or hypothesis being true, from its conformity to reason or experience, or from superior evidence or arguments adduced in its favor. A condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it." Black's Law Dictionary 1201 (6th ed.1990). See also Buckley v. Orem, 112 Idaho 117, 730 P.2d 1037 (1986) (used term "good likelihood" in the context of carrying a burden of proof by a preponderance of evidence); Morris v. Allstate Ins. Co., 632 So.2d 1209 (La. App.1994) (admitted medical testimony based upon a "good likelihood" although ultimately the trier of fact found otherwise).
[2] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Some scholars opine Daubert, sub silentio, overruled Barefoot v. Estelle which allowed receipt of questionable psychiatric evidence regarding "future dangerousness." Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), superseded by statute on other grounds as stated in United States v. Monroe, No. CIV.2:94, 1997 WL 472125 (N.D.Ga. July 24, 1997). See, e.g., Paul C. Giannelli, Daubert: Interpreting the Federal Rules of Evidence, 15 Cardozo L.Rev. 1999, 2020-21 (1994).